## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT T. MILLER            :
                              :     Civ. Action No.
     v.                       :
                              :     08 - cv - 0277
AMERICAN AIRLINES, INC.,       :
     and                   :     Judge Caputo
AMERICAN AIRLINES, INC. PILOT   :     Magistrate Judge Blewitt
RETIREMENT BENEFIT PROGRAM   :
FIXED INCOME PLAN (A PLAN)     :
     and                   :
AMERICAN AIRLINES, INC. PENSION   :
BENEFITS ADMINISTRATION      :
COMMITTEE                  :
_____ :

---

## PLAINTIFF ROBERT MILLER'S
## MEMORANDUM OF LAW IN SUPPORT
## OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Katie R. Eyer - ID. 200756
Michael J. Salmanson - I.D.  46707
SALMANSON GOLDSHAW, P.C.
Two Penn Center
1500 J.F.K. Blvd., Suite 1230
Philadelphia, PA  19102
215-640-0593
215-640-0596 (fax)

Date:  December 8, 2008

# TABLE OF CONTENTS

I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Facts and Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.   Statement of Questions Involved. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.   Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     A.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           i.     *De Novo* Review Must Be Applied By This Court to Issues
                  of Plan Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

           ii.    All Other Aspects of American's Determination Must Be
                  Reviewed at Least Under a Heightened Arbitrary and
                  Capricious Standard of Review. . . . . . . . . . . . . . . . . . . . . . 17

     B.     Defendants' Termination of Plaintiff Miller's Benefits Was
           Arbitrary and Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           i.     American Was Operating Under a Serious Structural
                  Conflict of Interest At the Time Mr. Miller's Benefits
                  Were Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

           ii.    Defendant's Termination of Mr. Miller's Benefits Was
                  Riddled With Procedural Irregularities. . . . . . . . . . . . . . . . . 25

                 a.     Defendants Terminated Mr. Miller's Benefits
                        Based on the Very Same Conditions and Treatment
                        That Were Previously Found to Support an Award
                        of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                 b.     Defendants Breached Their Fiduciary Duty and
                        Violated ERISA Claims Regulations By Failing

to Provide Mr. Miller With Adequate Information
About the Reasons for the Termination of His
Benefits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

c.   Departure From Standard Practices During Initial
Termination and On Appeal.. . . . . . . . . . . . . . . . . . 32

d.   Additional Violations of Claims Regulations. . . . . . . 34

iii.   Defendants' Determination Was Substantively Arbitrary
and Capricious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

a.   Failure to Address Mr. Miller's Diagnosis With
Anxiety Disorder NOS.. . . . . . . . . . . . . . . . . . . . . . . 37

b.   Failure to Consider Mr. Miller's Medical Treatment
and Reliance on an Erroneous Standard. . . . . . . . . . . 38

c.   Failure to Address the Requirements of
Mr. Miller's Job.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

d.   Reliance on Failure to Apply for FAA
Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

V.   Conclusions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

# TABLE OF AUTHORITIES

## Cases

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) .. . . . . . . . . . 21

*Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 39

*Alternative Care Systems v. Metropolitan Life Ins. Co.*, No. 92 Civ. 7208,
1996 WL67737 (S.D.N.Y. Feb. 16, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*,
12 F.3d 1292 (3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 32

*Burke v. Pitney Bowes*, – F.3d –, 2008 WL4276910 (9th Cir. 2008). . . . . . . . . . . 23

*Cook v. New York Times Co. Long Term Disability Plan*, No. 02 Civ.
9154, 2004 WL203111 (S.D.N.Y. Jan. 30, 2004).. . . . . . . . . . . . . . . . . . . 28, 32, 38

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).. . . . . . . . . . . . . . . . 14

*Gritzer v. CBS, Inc.*, 275 F.3d 291 (3d Cir. 2002). . . . . . . . . . . . . . . . . . . 15, 16, 17

*Grossmuller v. International Union*, 715 F.2d 853 (3d Cir. 1983). . . . . . . . . 22, 26

*Harrison v. Prudential Ins. Co.*, 543 F.Supp.2d 411 (E.D. Pa. 2008). . . . . . *passim*

*Heasley v. Belden & Blake Corp.*, 2 F.3d 1249 (3d Cir. 1993). . . . . . . . . . . . . . 40

*Kosiba v. Merck & Co.*, 384 F.3d 58 (3d Cir. 2004).. . . . . . . . . . . . . 18, 20, 25, 37

*McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586 (8th Cir. 2002). . . . . . . . . . 27

*Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008). . . . . . . . . . 22, 23, 25

*Miles v. New York State Teamsters Conference Pension & Retirement Fund*,
698 F.2d 593 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997) . . . . . . . . . . . 40, 42

*Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 16, 17

*Nerys v. Building Service 32B-J Health Fund*, No. 03 Civ. 0093, 2004
WL2210256 (S.D.N.Y. Sept. 30, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Post v. Hartford Ins. Co.*, 501 F.3d 154 (3d Cir. 2007). . . . . . . . . . . . . . 17, 18, 32

*Rosen v. Provident Life and Accident Ins. Co.*, No. 02-591, 2003
WL22254805 (E.D. Pa. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Rud v. Liberty Life Assurance Co. of Boston*, 438 F.3d 772 (7th Cir. 2006) . . . . 23

*Scott v. Hartford Life & Accident Ins. Co.*, No. Civ. A. 03-3696,
2004 WL1090997 (E.D. Pa. May 13, 2004). . . . . . . . . . . . . . . . . . 20, 22, 26, 28, 32

*Thorpe v. Continental Casualty Co.*, No. Civ. A. 01-5932, 2002
WL31845876 (E.D. Pa. Dec. 18, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Witte v. Connecticut General Life Ins. Co.*, No. 06-2755, 2007
WL4300224 (D.N.J. Dec. 6, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## Federal Regulations and Federal Register

14 C.F.R. §§ 67.201, 67.207. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 C.F.R. § 2560.503-1(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

29 C.F.R. § 2560.503-1(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

29 C.F.R. § 2560.503-1(j)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 35

29 C.F.R. § 2560.503-1(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 C.F.R. § 2560.503-1(m). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Preamble to Dep't of Labor Final Regs.
   65 Fed. Reg. at 70255-70256 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

## **Statutes**

29 U.S.C. § 1132(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## I.    <u>INTRODUCTION</u>

Plaintiff Robert Miller – a former pilot – was removed from a flight and committed to a psychiatric hospital in 1998 after suffering a psychotic break while co-piloting a plane.  *See* Plaintiff's Statement of Material Facts (*hereinafter* "SMF") ¶¶ 1-5.  Mr. Miller was subsequently found to be eligible for long-term disability benefits, which he then received for seven years.  SMF ¶¶ 8-10, 20, 35.  Despite this long history of disability, Mr. Miller's disability benefits were abruptly terminated in October 2006.  SMF ¶ 35.  As Defendants candidly admit, <u>there was no recent change to Mr. Miller's condition or treatment that precipitated this termination</u>.  SMF ¶ 36.  Indeed, Defendants are unable to identify <u>any</u> changes to Mr. Miller's condition or treatment during the more than three year time frame that preceded the termination of Mr. Miller's benefits.  *Id.*  During this same time frame, Mr. Miller's disability benefits were repeatedly approved for continuation on the basis of medical reviewers' determinations that he continued to fulfill the requirements for disability benefits eligibility. SMF ¶¶ 17-26.  Thus, Defendants in 2006 simply reversed their prior assessment that Mr. Miller was unable to pilot a plane, without any evidence that his psychiatric condition had in fact changed.

This abrupt – and unexplained – reversal of position is *alone* sufficient to require a determination that Defendants' termination of Mr. Miller's benefits was

arbitrary and capricious. It need not stand alone, however, as Defendants' reversal of position is only one of a multitude of serious substantive, procedural and structural errors that were committed in the termination of Mr. Miller's benefits. Among other things, Defendants: 1) failed to even *address* – much less reject – one of Mr. Miller's psychiatric diagnoses, *see* Section IV.B.iii.a; 2) applied standards to Mr. Miller's termination that were inconsistent with the terms of the Plan, *see* Section IV.B.iii.b & d; and 3) failed to inform Mr. Miller of the reasons for the termination of his benefits, *see* Section IV.B.ii.b.  For all of these reasons, among others, Defendants' termination of Mr. Miller's benefits was arbitrary and capricious under ERISA, and must be reversed.

## II.    <u>FACTS AND PROCEDURAL HISTORY</u>

Plaintiff Robert Miller served as a commercial airline pilot for American Airlines from 1989 through August 1998.  SMF ¶ 1.  In August 1998, Mr. Miller's mental state became unstable, as a result of which the flight that he was co-piloting had to be taxied back to the terminal.  SMF ¶¶ 2-3.  Mr. Miller was removed from the plane, and committed to a psychiatric hospital, where he was diagnosed with "severe psychosis."  SMF ¶¶ 4-5.  Following Mr. Miller's discharge from the hospital, he continued to be treated by Dr. Abel Gonzalez, who diagnosed him with Anxiety Disorder, NOS, R/O Generalized Anxiety Disorder

With Soft Obsessive Compulsive Features and S/P (Status Post) Brief Reactive

Psychosis.  SMF ¶¶ 6-7.

As a result of Mr. Miller's psychiatric conditions, and his resulting inability

to act as a pilot, American awarded Mr. Miller long term disability benefits in

1999.[1]  SMF ¶ 8.  Mr. Miller's medical certification, which was necessary for him

to serve as a pilot, was also revoked by the FAA.[2]  SMF ¶¶ 139-140.  From 1999

through 2003, Mr. Miller continued to receive long term disability benefits.  SMF

¶ 9.  In 2003, however, Mr. Miller's benefits were abruptly terminated, after

American's Medical and Occupational Health Services Department ("AAMOHS")

instated a disability management program, and experienced difficulties in

contacting Mr. Miller for information. SMF ¶ 10.

---

1.    American's disability plan is an "own occupation" disability plan, under
      which a plan participant qualifies for benefits if they are disqualified from
      serving as a commercial airline pilot for American, even if they could obtain
      employment in another capacity. SMF ¶¶ 128-129.

2.    Under federal regulations, an "established medical history or clinical
      diagnosis of...a psychosis" disqualifies a pilot from holding a second class
      airman medical certificate.  *See* 14 C.F.R. §§ 67.201, 67.207.  Pilots are also
      precluded from holding a certificate when they have "[any] other...mental
      condition that....[m]akes the person unable to safely perform the duties or
      exercise the privileges of the airman certificate applied for or held...". 14
      C.F.R. § 67.207.  Although pilots can theoretically seek a waiver of these
      criteria, Defendants' own witness testified that he is unaware of any
      occasion on which a pilot with a history of psychosis has been granted a
      waiver.  SMF ¶¶ 141-143.

Mr. Miller, upon being notified of the termination of his benefits, promptly contacted American seeking reinstatement. SMF ¶¶ 11, 14.  He spoke with Jeanne Spoon, the Nurse Case Manager assigned to his disability claims, seeking to determine what was necessary in order to obtain reinstatement of his benefits. SMF ¶¶ 12, 15.  Ms. Spoon advised Mr. Miller that he needed to submit medical documentation in order for his benefits to be reinstated, and noted in her own notes that those records would be reviewed to determine if they were adequate to "support continued medical disability."  SMF ¶ 13; *see also* SMF ¶ 16.

Dr. Gonzalez (Mr. Miller's psychiatrist) submitted a number of medical records at American's request, all of which were reviewed by Dr. Bettes (American's Corporate Medical Director) or Dr. Beaty (one of American's Area Medical Directors).  SMF ¶¶ 17, 19.  As indicated in those records, Mr. Miller continued to be diagnosed with Anxiety Disorder NOS and Status Post Brief Reactive Psychosis, and to be seen regularly by Dr. Gonzalez.  SMF ¶ 18. Mr. Miller's benefits were ultimately retroactively reinstated by Dr. Beaty on July 15, 2003, after it was determined that Mr. Miller was "[m]edically qualifie[d] for the disability pension program." SMF ¶¶ 20-21.

Dr. Gonzalez continued to regularly submit information to American documenting Mr. Miller's psychiatric status and treatment throughout the

following two years.  SMF ¶ 22.  As evidenced by those records (and conceded by American), Mr. Miller's psychiatric status and treatment remained constant during that time, and indeed at all times since January 2003.  SMF ¶¶ 24, 36.  Throughout that time, American repeatedly determined – consistent with its July 2003 reinstatement of benefits – that Mr. Miller continued to qualify for disability benefits.  SMF ¶ 25.  Indeed, American employees repeatedly reiterated throughout 2004 that they did not anticipate that Mr. Miller would return to work, and that his benefits should be continued.  SMF ¶ 26.

In August 2005, Dr. Gonzalez submitted a letter again affirming that Mr. Miller continued to be seen regularly.  SMF ¶ 27.  This letter was reviewed by Dr. Wolbrink (one of American's Area Medical Directors) in conjunction with Ms. Spoon.  SMF ¶ 28.  It was determined that authorization should be requested to submit Mr. Miller's case to the FAA for medical certification, and/or that, at a minimum, Mr. Miller's case should be submitted to AMAS, an entity that works with pilots to facilitate the FAA certification process.  SMF ¶¶ 29-30.

Despite this determination by American, and AAMOHS's general policy of notifying pilots where FAA recertification is deemed potentially relevant to their disability benefits[3], no request was ever made to Mr. Miller to apply for FAA

_____

3.    It appears that AAMOHS does – contrary to the plain language of the Plan and the position of the decision-maker for disability appeals – sometimes

medical certification, or to submit his information to AMAS.[4]  SMF ¶¶ 31-34.

Instead, Mr. Miller's disability benefits were abruptly terminated by Dr. Bettes

without prior warning in October 2006.  SMF ¶ 35, 37.  At the time of the

termination, the medical records provided by Dr. Gonzalez to American

demonstrated that there had been no change in Mr. Miller's mental status,

diagnosis or medical care, since at least January of 2003.  SMF ¶ 36.

    The termination letter sent to Mr. Miller provided absolutely no explanation

for the abrupt change in American's assessment of Mr. Miller's benefits eligibility.

SMF ¶ 38.  Indeed, the letter provided almost no information of any kind relating

to the reasons for the termination of Mr. Miller's disability benefits, simply stating

ambiguously that "we are unable to verify either the existence of a continuing

medical disability or your continued substantial progress towards obtaining your

FAA medical certification."  SMF ¶¶ 40-46.  The letter went on to quote from

---

consider a failure to seek FAA recertification as part of their determination
that a Pilot's disability benefits should be discontinued (which is itself, as
discussed *infra* Section IV.B.iii.d, erroneous).  SMF ¶¶ 130-32, 144.
Dr. Bettes, AAMOHS's chief officer, testified that a Pilot would be notified
by the Nurse Case Manager if FAA certification was deemed relevant to the
continuation of their disability benefits, a procedure that was not followed
in Mr. Miller's case.  SMF ¶ 145; *see also* SMF ¶¶ 31-34.

4.    Ms. Spoon did attempt to contact Mr. Miller by phone on a few isolated
occasions, but ceased contact attempts after receiving a busy signal.  SMF ¶
33.  No efforts were made to contact Mr. Miller by mail.  SMF ¶ 34.

several provisions of the American Plan, without indicating whether or not those provisions in fact had formed a basis for the termination of Mr. Miller's benefits.[5] SMF ¶ 46.

Notably, a failure to seek FAA medical recertification – the only basis clearly identified in the letter for the termination of Mr. Miller's benefits – is not a basis for termination of benefits under the American Plan.  SMF ¶¶ 130-32.  As explained by the decision-maker who denied Mr. Miller's appeal "...the Plan has no requirement....for the pilot to continue to try to get their FAA designation...In this case [under American's Plan] you have to be disabled from the occupation of pilot, and the FAA certification is not specifically relevant."  SMF ¶¶ 131-32.  Despite the plain irrelevance of this criteria, the <u>only</u> guidance provided to Mr. Miller in his termination letter relating to how he might obtain reinstatement was that "In order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing obtaining your FAA medical certification."  SMF ¶ 45.

---

5.     Testimony during depositions in this case revealed that the termination letter sent to Mr. Miller is based on a form letter.  SMF ¶ 47.  The only portion of the letter that Dr. Bettes could identify as being particularized to Mr. Miller's circumstances was the portion dealing with FAA medical certification.  SMF ¶ 49.

Mr. Miller, unable to determine the reasons for the termination for his

benefits, contacted American on November 7, 2006 to obtain further information.

SMF ¶ 51.  Despite the fact that Mr. Miller informed Ms. Spoon that "there was no

reason given for stopping benefits," Ms. Spoon refused to provide Mr. Miller with

further information, and simply referred him to the termination letter.  SMF ¶¶ 52-

53.  Ms. Spoon subsequently emailed Dr. Bettes about Mr. Miller's call, who

indicated: "I have reviewed the file and documentation and feel that we have

fulfilled our obligation under ERISA...".  SMF ¶¶ 54-55.   In accordance with

Dr. Bettes' response, no further information beyond the termination letter was

provided to Mr. Miller.[6]  SMF ¶ 56.

Despite the limited information available to him, Mr. Miller filed an appeal

of the termination of his benefits to the Pension Benefits Administration

Committee (PBAC) on November 30, 2006.  SMF ¶ 60.  In support of his appeal,

Mr. Miller submitted a letter from Dr. Gonzalez, reaffirming Mr. Miller's

continued diagnosis with Anxiety Disorder NOS, R/O Generalized Anxiety

---

6.    Dr. Bettes testified that it is AAMOHS's standard practice to refuse to
      provide pilots with further information beyond the termination letter, where
      AAMOHS is contacted by pilots seeking further information.  SMF ¶ 57;
      *see also* SMF ¶ 58.  Dr. Bettes further testified that this practice is applied
      even where a claimant was receiving disability benefits due to a psychiatric
      disability, since "we are talking about a population of airline pilots...[and]
      it's assumed that they can understand the documentation that's written to
      them." SMF ¶ 59.

Disorder With Soft Obsessive Compulsive Features and S/P (Status Post) Brief Reactive Psychosis.  SMF ¶¶ 61-62.  Dr. Gonzalez further observed that Mr. Miller continued to undergo active medical treatment supervised by Dr. Gonzalez in the form of stress management techniques and sleep hygiene measures.  SMF ¶ 63.  Dr. Gonzalez opined that Mr. Miller's mental illness was "permanent" and disqualified Mr. Miller from obtaining FAA medical certification.  SMF ¶ 64.  Mr. Miller also submitted a statement on his own behalf, reiterating his continued Anxiety Disorder and history of Psychosis, and his inability to obtain FAA certification as a result.  SMF ¶¶ 65-66.

On March 27, 2007 – <u>after</u> the date that a response to Mr. Miller's appeal was due –  a request was sent by American to an outside medical evaluator, Western Medical Evaluators (WME), to review Mr. Miller's appeal.  SMF ¶ 69; *see also* SMF ¶¶ 146-151.  Among other things, WME was asked by American to address whether Mr. Miller continued to have a psychiatric diagnosis, and if so, what treatment would be medically appropriate for that diagnosis.  SMF ¶ 70.

In order to perform their assessment, WME was provided with a number of documents, including:

- Mr. Miller's appeal submission.

- •    American's "Job Description and Essential Functions" for
       Mr. Miller's position.

- •    The medical records maintained by AAMOHS, including records
       previously found to <u>support</u> Mr. Miller's continued disability
       benefits.

- •    Excerpts of the Plan.  SMF ¶ 72.

WME did not conduct an in-person or telephone evaluation of Mr. Miller.  SMF ¶ 73.

WME's report was provided to American on April 20, 2007.  SMF ¶ 74. This report – which concluded that Mr. Miler was no longer disabled – suffered from a number of patent and serious deficiencies in addressing Mr. Miller's eligibility for continued disability benefits.  Most notably, despite American's express request, neither of the doctors who performed the review addressed whether Mr. Miller continued to have a current psychiatric diagnosis.  SMF ¶ 75. Indeed, aside from a summary of records at the outset of the review, neither reviewer even <u>mentioned</u> Mr. Miller's diagnosis with Anxiety Disorder, NOS, much less specified that they disagreed with that diagnosis.  SMF ¶¶ 76-77.  On the contrary, both reviewers focused exclusively on Mr. Miller's 1998 psychotic episode, without consideration of his continuing Anxiety Disorder.  SMF ¶ 78.

Unsurprisingly, given the report's utter failure to address Mr. Miller's Anxiety Disorder, the report also – despite American's express request – failed entirely to address what medical care is appropriate for Anxiety Disorder, NOS, and specifically whether Mr. Miller's medical care was "consistent with" that disorder.  SMF ¶¶ 79-80.  In fact, both of the forms of treatment that Mr. Miller was continuing to receive in 2006 – stress management and sleep hygiene – are widely recognized as medically appropriate treatments for anxiety disorders.  SMF ¶ 81.  The WME report – although appearing to generally disparage the significance of Mr. Miller's continued treatment by Dr. Gonzalez – did not directly take issue with this proposition, simply ignoring the issue of whether the medical care Mr. Miller continued to receive was "consistent with" his anxiety disorder.  SMF ¶¶ 79-80.

These obvious and significant errors were further compounded by the fact that neither reviewer addressed in any way the actual qualifications for serving as a commercial airline pilot – an exceptionally difficult and stressful position – and whether Mr. Miller could fulfill those qualifications in view of his diagnosis and treatment.  SMF ¶¶ 82, 84.  Those qualifications include, among other things:

- "Capability of decision-making under stress."

- •   "The ability to adapt to diversified flight schedules, situations, or scenarios."

- •   "[A]daptable personality."

- •   Ability to "work varying hours of the day or night" and be "on duty for as long as twelve to fourteen hours... span[ning] many time zones and extreme weather differences in the course of a trip."  SMF ¶ 83.

Despite the obvious and serious impediment that Mr. Miller's Anxiety Disorder, and treatment for same, would pose to Mr. Miller's ability to fulfill these and other job qualifications for work as a commercial pilot, no mention was made by either of the reviewers of the job requirements of a commercial airline pilot.  SMF ¶¶ 82, 84; *see also* SMF ¶ 85.

Finally, despite the fact that reapplying for FAA medical certification is <u>not</u> a requirement for continued benefits under American's disability Plan, WME's report focused extensively on Mr. Miller's failure to reapply for FAA certification in concluding that he is not disabled.  SMF ¶ 86; *see also* SMF ¶¶ 130-32.

On May 22, 2007 – nearly 6 months after the filing of Mr. Miller's appeal, and long after the appeal response was due –  Mr. Miller's appeal was denied.  SMF ¶¶ 93, 146-151.  The termination letter quoted the entirety of the WME report verbatim, summarizing in conclusion that "Western Medical Evaluators

determined that the evidence presented does not document continuing disability beyond October 23, 2006, and does not document continued appropriate medical care and treatment for a condition giving rise to a disability.  In view of this determination, AAMOHS' discontinuance of the Pilot's LTD benefits under the Plan was...proper...".  SMF ¶ 94.  No other analysis of whether termination of Mr. Miller's disability benefits was appropriate was provided.  SMF ¶ 95.

Subsequent to receiving notification that his appeal was denied, Mr. Miller requested that American provide all "relevant" documents, as defined under ERISA's claims regulations.  SMF ¶ 101.  Despite the fact that ERISA's regulations specifically require the disclosure of all records that were relied on, submitted, considered or generated in the course of making the benefit determination – and that American represented to Mr. Miller that all such documents were in fact provided – American in fact withheld the only document that was unquestionably reviewed or relied on in rendering a determination on Mr. Miller's appeal.  SMF ¶¶ 102-04; *see also* 29 C.F.R. § 2560.503-1(j)(3). American's failure to disclose this document was particularly egregious, since it would have revealed that Mr. Miller's appeal was not in fact decided by the PBAC (as specified in the May 22, 2007 termination letter), but was instead decided by

an individual named Charlotte Teklitz (apparently the PBAC's delegatee).[7]  SMF ¶¶ 97-100, 105.

The instant action was filed on February 13, 2008, raising a single claim for benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), and seeking attorneys fees. SMF ¶ 152.

## III.   STATEMENT OF QUESTIONS INVOLVED

     1.     What standard of review should be applied to Mr. Miller's claims?[8]

     2.     Was American's termination of Mr. Miller's benefits arbitrary and capricious?

## IV.   ARGUMENT

### A.   Standard of Review

Pursuant to *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), claims brought by under ERISA § 1132(a)(1)(B) are evaluated under a *de novo* standard, except where the underlying Plan affords the administrator discretionary

---

7.    American has provided no explanation at any time for why it was initially claimed that the PBAC itself reviewed and decided Mr. Miller's appeal, or why the only record that was undisputably considered or relied on in rendering a determination on Mr. Miller's appeal was withheld.

8.    As discussed *infra*, if the Court concludes at this first step that *de novo* review should be applied to the merits of American's decision, it should not proceed to the second question, and should instead deny all summary judgment motions pending further discovery, pursuant to the parties' Joint Case Management Plan and Fed. R. Civ. P. 56(f).  *See* note 10, *infra*.

authority.  Three distinct determinations are necessary in order to determine the

appropriate standard of review in a particular § 1132(a)(1)(B) case: 1) whether the

Plan affords the decision-maker discretionary authority to interpret the terms of

the Plan, and if so whether that discretionary authority was exercised; 2) whether

the Plan otherwise affords the decision-maker discretionary authority in rendering

determinations with respect to benefits claims; and 3) whether any structural

conflicts of interest or procedural irregularities exist that alter the proper standard

of review.   In the instant case, it is clear that the decision-maker in this case was

<u>not</u> afforded, and in fact <u>did not</u> exercise any discretionary authority with respect

to the meaning of the terms of the Plan.  Thus, *de novo* review must be applied to

the meaning of such terms.  It is further apparent that – although the decision-

maker was afforded general discretionary authority for rendering determinations

with respect to appeals – overwhelming procedural irregularities and structural

conflicts of interest mandate the application of, at a minimum, an extremely

heightened arbitrary and capricious standard of review.  Each of these issues is

addressed in turn below.

    i.   ***De Novo* Review Must Be Applied By This Court to Issues of Plan Interpretation**

   Under the Third Circuit's decision in *Gritzer v. CBS, Inc.*, 275 F.3d 291 (3d

Cir. 2002), deference to a Plan Administrator's interpretation of a Plan is only

appropriate where the Plan affords the Administrator discretion to interpret its

terms, <u>and</u> such discretion was actually exercised. *See id.* at 296; *see also Moench*

*v. Robertson*, 62 F.3d 553, 567 (3d Cir. 1995).  In the instant case, it is apparent

that such authority was neither granted to nor exercised by the decision-maker in

Mr. Miller's case.  Thus, *de novo* review of the plan terms must be applied by this

Court.

Authority to construe the Plan's terms is specifically delegated to the PBAC

– an entity that had no involvement in Mr. Miller's appeal – under Section 13.3 of

the Plan.  SMF ¶ 122; *see also* SMF ¶ 98.  Although there is evidence to suggest

that Ms. Teklitz (the individual who actually decided Mr. Miller's appeal) was

delegated *other* limited aspects of the PBAC's discretionary authority, there is

absolutely no evidence to suggest that she was delegated such authority with

respect to matters of Plan interpretation.  SMF ¶¶ 123-25; *see also* SMF ¶ 99.

Indeed, Ms. Teklitz's own testimony indicates that she did not understand herself

to have been delegated authority to interpret the terms of the Plan.  SMF ¶¶ 123-

25.  Finally, and most strikingly, Ms. Teklitz clearly did not – in actuality – issue

an interpretation of the Plan provisions at issue in this case, and indeed expressly

disclaimed responsibility for interpreting at least one of the key Plan provisions at

issue in this case.  SMF ¶¶ 125-27.  Thus, Ms. Teklitz was neither delegated

discretionary authority to interpret the terms of the Plan, nor did she exercise such authority, and *de novo* review of the Plan terms must be applied.[9]  *See, e.g., Gritzer,* 275 F.3d at 296; *Moench*, 62 F.3d at 567-68.

> **ii.     All Other Aspects of American's Determination Must Be Reviewed at Least Under a Heightened Arbitrary and Capricious Standard of Review**

All other aspects of American's determination must be reviewed – at a minimum – under an extremely heightened arbitrary and capricious standard of review.  Under the terms of American's Plan, discretionary authority is afforded to the PBAC to generally decide disability benefits appeals, and it does appear that the decision-maker in this case was delegated basic authority for rendering appeals determinations.  SMF ¶¶ 122-23.  However, numerous procedural irregularities (including violations of ERISA's claims regulations) and structural conflicts of interest also exist in this case.  As the Third Circuit has recognized, such conflicts and irregularities warrant the application of a heightened arbitrary and capricious standard of review, or, in certain circumstances, *de novo* review.  *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 160-65 (3d Cir. 2007); *Kosiba v. Merck & Co.*,

---

9.     For these reasons alone, *de novo* review of the meaning of the Plan terms is mandated in this case.  However, the factors discussed in  Section IV.A.ii would also require the application of at least a very heightened arbitrary and capricious standard of review to Ms. Teklitz's interpretation of the Plan terms, even if *de novo* review were not independently warranted.

384 F.3d 58, 64-68 (3d Cir. 2004); *see also* 29 C.F.R. § 2560.503-1(l); Preamble

to Dep't of Labor Final Regs., 65 Fed. Reg. at 70255-70256 (indicating that

violations of ERISA's claims regulations warrant the application of a *de novo*

standard of review).   The extent to which the standard of review is heightened in a

particular case is determined by reference to the nature and extent of the conflicts

and irregularities that exist in a particular case.   *See, e.g., Post*, 501 F.3d at 160-

65; *Kosiba*, 384 F.3d at 64-68.   Where, as here, there is abundant evidence of

extensive procedural irregularities and of a structural conflict of interest, an

extremely heightened arbitrary and capricious standard of review (or, alternatively

*de novo* review) must be applied.   *See, e.g., Post*, 501 F.3d at 160-65; *Kosiba*, 384

F.3d at 64-68; *Harrison v. Prudential Ins. Co.*, 543 F.Supp.2d 411, 421-24 (E.D.

Pa. 2008); *see also* 65 Fed. Reg. at 70255-56.

      The procedural irregularities and structural conflicts of interest in this case

include:

      •      Failure to provide Plaintiff with meaningful information relating to

           the reasons for the termination of his benefits in 2006, in violation of

           ERISA claims regulations and Defendants' fiduciary obligations, *see*

           Section IV.B.ii.b, *infra*.

- Termination of Plaintiff's benefits after years of specifically approving such benefits, despite the fact that there was no change in Plaintiff's medical condition or treatment therefor, *see* Section IV.B.ii.a, *infra*.

- Payment of benefits out of a severely underfunded Plan, which resulted in a structural conflict of interest for Defendants, *see* Section IV.B.i., *infra*.

- Reliance on factors in terminating Mr. Miller's benefits that are not legitimate bases for terminating benefits under the Plan, *see* Sections IV.B.iii.b and IV.B.iii.d, *infra*.

- Abruptly terminating Mr. Miller's benefits, instead of following AAMOHS's usual practice of first informing claimants when it has been determined that they should reapply for FAA medical certification, *see* Section IV.B.ii.c, *infra*.

- Failure to seek further information or corrections to the WME report, despite the fact that that report included numerous errors and omissions, and despite the fact that American typically seeks further information or corrections in exactly the type of circumstances at issue in Mr. Miller's case, *see* Section IV.B.ii.c, *infra*.

- Rendering a decision on Mr. Miller's appeal in an extremely untimely fashion, in violation of ERISA's claims regulations, *see* Section IV.B.ii.d, *infra*.

- Withholding documents that Defendants were required to produce under ERISA's claims regulations, and misrepresenting to Plaintiff whether such documents had been produced, *see* Section IV.B.ii.d, *infra*.

Because these procedural irregularities and structural conflicts of interest also bear substantially on the issue of whether Defendants' decision was substantively arbitrary and capricious, their details are discussed principally in Section IV.B., below, to avoid redundancy.  *See generally Scott v. Hartford Life & Accident Ins. Co.*, No. Civ. A. 03-3696, 2004 WL 1090994, *3 n.1 (E.D. Pa. May 13, 2004) (many of the same factors will often factor into the Court's determination of the proper standard of review, and conclusion on the merits).

Collectively, these procedural irregularities and structural conflicts of interest call for the application of, at a minimum, an extremely heightened arbitrary and capricious standard of review.  *See, e.g., Kosiba*, 384 F.3d at 68 (concluding that it would be appropriate to apply a "significantly heightened" arbitrary and capricious standard of review where both procedural irregularities

and a structural conflict of interest exist); *see also Harrison*, 543 F.Supp.2d at

421-24 (concluding on the basis of facts less egregious than the instant case that

review at the far end of the heightened arbitrary and capricious scale was

appropriate).  Indeed, the procedural irregularities and structural conflicts of

interest in this case are so extreme that they justify the application of a *de novo*

standard of review.[10]  *See, e.g., Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d

955, 959 (9th Cir. 2006) (en banc); *see also* 65 Fed. Reg. at 70255-56 (violations

of ERISA's claims regulations warrant the application of a *de novo* standard of

review).

**B.     Defendants' Termination of Plaintiff Miller's Benefits Was
         Arbitrary and Capricious**

As recognized by the Third Circuit and the United States Supreme Court, *all*

potentially relevant errors and irregularities – substantive, structural and

procedural – must be considered in determining whether or not an ERISA Plan's

denial of a benefits claim is arbitrary and capricious.  *See, e.g., Metropolitan Life*

_____

10.    In the event that this Court grants *de novo* review on the substantive merits
       of Plaintiff's disability claim, Plaintiff respectfully requests that both
       parties' motions be denied pursuant to Rule 56(f), and that discovery be
       reopened to permit discovery on the substantive merits of Plaintiff's
       disability claim.  At the time of the parties' initial Joint Case Management
       Plan, both parties agreed that such further discovery would be warranted if
       *de novo* review was granted, but that it would be appropriate to defer such
       discovery pending this Court's ruling on the propriety of *de novo* review.
       SMF ¶ 153.

*Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2351-2 (2008); *Grossmuller v. International Union*, 715 F.2d 853, 859 (3d Cir. 1983); *Harrison*, 543 F.Supp.2d at 423-24; *Scott*, No. 03-3696, 2004 WL 1090994 at * 4-5. Where substantive factors, structural factors, procedural factors, <u>or any combination thereof</u> render a Plan's decision unreasonable or arbitrary, reversal of the Plan's termination of benefits is appropriate. *See, e.g., Metropolitan Life*, 128 S.Ct. at 2351-2; *Harrison*, 543 F.Supp.2d at 423-24; *see also Scott*, No. 03-3696, 2004 WL 1090994 at *4-5. As set forth below, numerous structural, procedural and substantive irregularities and errors exist in this case. Moreover, many of these structural, procedural and substantive irregularities and errors would be sufficient – standing alone – to warrant a finding of arbitrary and capriciousness. Collectively, there can be no doubt that the Defendants' termination of Mr. Miller's benefits was arbitrary and capricious, and must be reversed.

> **i.    American Was Operating Under a Serious Structural Conflict of Interest At the Time Mr. Miller's Benefits Were Denied**

The initial factor that this Court must consider in determining whether Defendants' termination of Mr. Miller's benefits was arbitrary and capricious is whether the Plan was acting under a structural conflict of interest at the time Mr. Miller's benefits were terminated. *See e.g., Metropolitan Life*, 128 S.Ct. at

2351-2 (the existence of a structural conflict of interest must be weighted as a factor in assessing the lawfulness of benefits denials).  As the United States Supreme Court has recognized, a structural conflict of interest typically exists where, as here, an employer both funds a Plan and evaluates claims.  *See id.* at 2348 (the existence of a conflict "is clear where it is the employer that both funds the plan and evaluates the claim.")  Because the American both fully funds the trust fund that pays pilot disability benefits, and determines eligibility for benefits, *see* SMF ¶¶ 110-112, it has an inherent financial incentive to deny potentially meritorious claims.  *Id.*; *see also Burke v. Pitney Bowes*, – F.3d –, 2008 WL 4276910, *8 (9th Cir. 2008) (concluding based on *Met Life* that even where a plan's benefits are paid out of a trust, a structural conflict of interest still exists where an employer is responsible for funding the trust and administering benefits).

**REDACTED - FULL VERSION FILED UNDER SEAL**

**REDACTED - FULL VERSION FILED UNDER SEAL**

Defendants' own 10-K Report, submitted to the Securities and Exchange Commission on February 24, 2006, specifically identified Defendants' "substantial, and increasing, pension funding obligations" as a key risk factor that could adversely effect their "business and liquidity."[11]  SMF ¶ 117.  The report further noted that Defendants' defined benefit plans (of which the Plan at issue in this case was one) were underfunded by approximately $3.2 <u>billion</u> based on Projected Benefit Obligation (PBO).  SMF ¶¶ 118-119.  Indeed, the risk to American's business of its underfunded pension plans was perceived to be so great that American was involved in lobbying for pension relief legislation during 2006 and 2007 – the very years at issue in the instant litigation. SMF ¶ 120.

Moreover, testimony in the instant case establishes that the decision-maker with respect to Mr. Miller's appeal, Ms. Teklitz, was aware of the underfunding of

---

11.   The Plan that paid Mr. Miller's long term disability benefits is also a pension plan. SMF ¶ 119.

American's pension plans, and of American's efforts to lobby for relief from its

pension funding obligations.  SMF ¶ 121.  As discussed, *infra*, Ms. Teklitz

deviated from her usual practices in considering Mr. Miller's appeal, evidence that

strongly supports the conclusion that American not only had a structural conflict

of interest, but was affected by it in this specific case.[12]  *See* Section IV.B.ii.c,

*infra*.  In these circumstances, it is appropriate for the existence of a structural

conflict of interest to be weighed heavily by the Court in determining whether the

Plan's decision was arbitrary and capricious.[13]  *See, e.g., Metropolitan Life,* 128

S.Ct. at 2351.

> ### ii.     Defendant's Termination of Mr. Miller's Benefits Was Riddled With Procedural Irregularities

The Defendants' termination of Mr. Miller's benefits was also riddled with

procedural irregularities and errors.  Indeed, the extensive and serious procedural

irregularities in this case (including numerous violations of ERISA's claims

regulations) are <u>alone</u> sufficient to justify a reversal of Defendants' termination

---

12.   The highly irregular way in which Mr. Miller's claim was handled at the AAMOHS level also suggests that the initial termination of Mr. Miller's benefits was tainted by American's structural conflict of interest.  *See generally* Section II, *supra* and Section IV.B.ii.c, *infra*.

13.   Mr. Miler was also a former employee at the time that his benefits were terminated, a factor that the Third Circuit has observed may heighten the impact of a structural conflict of interest.  *See, e.g., Kosiba v. Merck & Co.*, 384 F.3d 58, 65-66 (3d Cir. 2004).

decision in this case.  *See, e.g., Harrison v. Prudential Ins. Co.*, 543 F.Supp.2d 411, 423-24 (E.D. Pa. 2008); *Scott v. Hartford Life and Accident Ins. Co.*, No. 03-3696, 2004 WL 1090994, * 4-5 (E.D. Pa. May 13, 2004); *see also Grossmuller v. International Union*, 715 F.2d 853, 859 (3d Cir. 1983).  As set forth below, these procedural irregularities denied Mr. Miller of a fair review process, and constituted a clear abdication of American's ERISA-mandated role as a fiduciary.

> ### a. Defendants Terminated Mr. Miller's Benefits Based on the Very Same Conditions and Treatment That Were Previously Found to Support an Award of Benefits

As American candidly admits, "Defendants cannot determine from the medical documentation produced by Plaintiff and his treating physician whether there was any change that occurred in Plaintiff's psychiatric condition or treatment [between January 2003 and May 2007]."  SMF ¶ 36(a).  The decision-makers in this case similarly could not identify a <u>single change</u> to Plaintiff's psychiatric condition or treatment that may have influenced their determination to terminate Mr. Miller's benefits.  SMF ¶ 36(b), (c).  American nonetheless abruptly terminated Mr. Miller's benefits in 2006 (and upheld that termination in 2007), after years of concluding that the very same conditions and treatment that

Mr. Miller had at the time of termination qualified him for benefits.[14]  SMF ¶¶ 12-

26, 35-36.  As the courts have recognized, this type of reversal of position

constitutes a very serious procedural irregularity, and alone justifies a reversal of a

benefits termination.  *See, e.g., Harrison*, 543 F.Supp.2d at 421; *see also McOsker*

*v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589-90 (8th Cir. 2002); *Thorpe v.*

*Continental Casualty Co.*, No. Civ. A. 01-5932, 2002 WL 31845876, *4 (E.D. Pa.

Dec. 18, 2002).

        The egregiousness of this reversal of position was further heightened by the

utter failure of Defendants to provide any explanation at *any* time for their reversal

of position, or to notify Mr. Miller that the medical documentation that had

previously formed the basis for an award of benefits might now be used to justify a

denial of benefits.  SMF ¶¶ 38-39, 89-90.  Indeed, these two failures very seriously

compromised Mr. Miller's entitlement to a fair review process.  Because

Mr. Miller was never afforded <u>any</u> explanation for why American had changed

their position (or indeed <u>whether</u> American had truly changed their position), he

had absolutely no way of knowing what evidence or arguments would be pertinent

to address on appeal.  SMF ¶¶ 38-39.  Even more egregiously, he was never

---

14.   Plaintiff anticipates that Defendants will contend that they did not actually
       undertake any assessment of Plaintiff's eligibility for benefits during the
       2003 through 2007 time frame.  This contention is flatly contradicted by the
       record in this case.  SMF ¶¶ 12-26.

informed that the <u>very same records</u> that American had previously concluded

*supported* the continuation of disability benefits could (and in fact would) be

considered as a basis for *terminating* his benefits on appeal.  SMF ¶¶ 89-90.  In

view of this silence, and Defendants' prior actions, Mr. Miller had absolutely no

reason to believe that there was any need to explain those records, or to mention

any potential reasons why those records – some of which dated years prior to the

termination – were no longer relevant.  SMF ¶ 89.  Thus, Defendants' actions very

seriously impaired Mr. Miller's ability to address the reasons for the termination of

his benefits, and resulted in an obvious deprivation of Mr. Miller's entitlement to a

full and fair review.[15]  *See, e.g., Scott v. Hartford Life and Accident Ins. Co.*, No.

03-3696, 2004 WL 1090994, * 4-5 (E.D. Pa. May 13, 2004); *see also Cook v. New

York Times Co. Long Term Disability Plan*, No. 02 Civ. 9154, 2004 WL 203111,

*5-7 (S.D.N.Y. Jan. 30, 2004).

------

15.   In view of Defendants' utter failure to inform Mr. Miller that documents
      that had previously formed the basis for the continuation of his benefits
      could be considered as evidence in support of the *termination* of his
      benefits, Defendants should be precluded from relying on such documents
      in arguing that Mr. Miller's disability benefits termination was warranted.

**b.     Defendants Breached Their Fiduciary Duty and Violated ERISA Claims Regulations By Failing to Provide Mr. Miller With Adequate Information About the Reasons for the Termination of His Benefits**

Defendants also breached their fiduciary duty and violated ERISA claims regulations by failing to provide Mr. Miller with adequate information about the reasons for the termination of his benefits.  Under ERISA claims regulations, Defendants were required to provide, "in a manner calculated to be understood by the claimant...(i) The specific reason or reasons for the adverse benefit determination...[and] (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary..."  29 C.F.R. § 2560.503-1(g).  Moreover, as Plan fiduciaries, Defendants were required to "convey complete and accurate information material to [Mr. Miller's] circumstance[s]...even if that information comprises elements about which the beneficiary has not specifically inquired." *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1301 (3d Cir. 1993).

Despite these clear legal obligations, the October 2006 letter terminating Mr. Miller's benefits failed to provide a comprehensible explanation for why Mr. Miller's benefits were being terminated, or what further information was

required in order to reverse the termination decision.  SMF ¶¶ 38, 40-46.  Indeed, the termination letter actively misled Mr. Miller, insofar as it identified his failure to reapply for FAA certification – which is not a basis for terminating benefits under the Plan – as the only clearly articulated basis for the termination of his benefits.  SMF ¶¶ 45, 130.  *Cf. Harrison v. Prudential Ins. Co.*, 543 F.Supp.2d 411, 422 (E.D. Pa. 2008) (a Plan administrator's reliance on non-existent Plan terms is a significant procedural irregularity and calls into question their impartiality).   No further guidance was provided to Mr. Miller as to why – after years of being approved for benefits based on the same psychiatric conditions and treatment – he was no longer qualified for benefits.[16]  SMF ¶¶ 38, 40-46.

Notably, it is not only Plaintiff or Plaintiff's counsel who find the termination letter that Mr. Miller received to be insufficiently clear to determine the basis for the termination of Mr. Miller's benefits.  Dr. Bettes – who made the decision to terminate Mr. Miller's benefits, and thus is obviously in the *best* position of any individual to determine the meaning of the letter that Mr. Miller received – repeatedly testified that *he* could not determine the precise bases for the termination of Mr. Miller's benefits on the basis of the information appearing in

---

16.    It is American's standard practice to use this type of a "form" termination letter, which provides little or no information about the actual reasons for terminating a specific pilot's benefits.  SMF ¶ 48.

the letter.  SMF ¶ 50.  In view of the Dr. Bettes' inability to determine based on

the letter what the basis for his own decision was, Defendants simply cannot

credibly claim that Mr. Miller was afforded adequate notice of the reasons for the

termination of his benefits.

Strikingly, Defendants – when afforded an opportunity to correct this initial

error – instead compounded it by further violating their legal obligations vis-a-vis

Mr. Miller.  As noted *supra*, Mr. Miller directly contacted American in November

2006, and – according to their own documentation – expressly informed them that

"there was no reason given for stopping benefits."  SMF ¶¶ 51-52.  Thus,

American was fully aware that Mr. Miller *did not* in fact understand the basis for

the termination of his benefits.  *Id.*  In complete abrogation of American's

fiduciary obligations and the requirements of the ERISA claims regulations,

American refused to provide Mr. Miller with information beyond the termination

letter.  SMF ¶¶ 53-56; *see also Bixler*, 12 F.3d at 1300-03.  Strikingly, American

witnesses testified that this is the <u>standard procedure</u> for dealing with disability

claimants, when those claimants request further information about the reasons for

the termination of their benefits.  SMF ¶¶ 57-59.

Because Defendants utterly failed to provide Mr. Miller with adequate

information regarding the reasons for the termination of his benefits – in violation

of the ERISA claims regulations and their fiduciary obligations – their termination

of his benefits was arbitrary and capricious and must be reversed.  *See, e.g., Scott*,

No. 03-3696, 2004 WL 1090994 at * 4-5; *Cook*, No. 02 Civ. 9154, 2004 WL

203111 at *5-7; *Nerys v. Building Service 32B-J Health Fund*, No. 03 Civ. 0093,

2004 WL 2210256, *7-10 (S.D.N.Y. Sept. 30, 2004); *Alternative Care Systems v.

Metropolitan Life Ins. Co.*, No. 92 Civ. 7208, 1996 WL 67737, *2-5 (S.D.N.Y.

Feb. 16, 1996); *see also Bixler*, 12 F.3d at 1300-03.

### c.   Departure From Standard Practices During Initial Termination and On Appeal

As numerous courts have noted, departures from a Plan's procedural norms

"cannot but raise questions about its neutrality."  *Post v. Hartford Ins. Co.*, 501

F.3d 154, 165 (3d Cir. 2007).  In the instant case, there were several departures

from American's ordinary practices – both at the AAMOHS level and on appeal –

that seriously call into question Defendants' neutrality.  These departures also

significantly compromised Mr. Miller's entitlement to a full and fair review

process.

The departures from American's standard practices began in late 2005,

shortly prior to the termination of Mr. Miller's benefits.  At that time, it was

determined by AAMOHS staff that Mr. Miller should reapply for FAA

certification, or at a minimum should work with AMAS, to determine the

feasibility of obtaining recertification.[17]  SMF ¶¶ 29-30.  Despite a standard

AAMOHS practice of informing pilots when FAA recertification is believed to

potentially be relevant to the continuation of their disability benefits, and despite

an express determination that Mr. Miller should be contacted regarding this issue,

Mr. Miller was never informed of AAMOHS's determination in this regard.  SMF

¶¶ 29-34, 145.  Instead, AAMOHS simply abruptly terminated Mr. Miller's

benefits, with no prior notice that it wanted him to pursue FAA recertification.

SMF ¶¶ 31-35.

Significant departures from American's standard practices continued

through the appeals process.  The PBAC's delegatee, Charlotte Teklitz, testified

that she typically will request further review and/or corrections or clarifications of

WME's report where WME's report has any of a number of types of omissions or

deficiencies.  SMF ¶ 91; *see also* SMF ¶¶ 71, 85, 87-88.  Strikingly, several of the

precise areas that Ms. Teklitz testified would cause her to seek further review,

corrections or clarifications were present in Mr. Miller's case, and yet Ms. Teklitz

nonetheless utterly failed to take any steps to clarify or correct these notable

deficiencies. SMF ¶¶ 70-71, 75-88, 91-92.

---

17.   As discussed, *supra*, this requirement was itself inconsistent with the terms
      of the Plan.  SMF ¶¶ 130-132.

Finally – as discussed at greater length below – American handled

Mr. Miller's appeal in an extremely untimely fashion, and failed to disclose certain

requested records, procedural irregularities that <u>both</u> constituted a departures from

its standard procedures, and constituted violations of ERISA's claims regulations.

### d.    Additional Violations of Claims Regulations

ERISA claims regulations require that appeals from disability benefits

appeals be decided within 45 days after the plan's receipt of the claimant's request

for review.[18]  *See* 29 C.F.R. § 2560.503-1(i)(1) & (3).  American's Plan's claims

appeals procedures similarly require that "[i]f....the PBAC (or its delegate) denies

the claim that the pilot has a Disability, a notice will be provided...not later than 45

days from the day the request for a review was received by the Plan

Administrator."  SMF ¶ 147.  Despite these clear requirements, American only

sent Mr. Miller's claim out for external review on March 27, 2007, <u>after</u> they were

---

18.   Plans are allowed to extend this time period by an additional 45 days, if they specifically inform the claimant that special circumstances necessitate an extension of time, and specify what special circumstances require the extension.  *See* 29 C.F.R. § 2560.503-1(i)(1) & (3).  There is no evidence in this case that the Plan ever informed Mr. Miller of any special circumstances necessitating an extension of time in connection with his appeal.  SMF ¶ 149.  More importantly, the Plan's resolution of Mr. Miller's appeal would still be untimely, even if a 90 day period were applied.  SMF ¶¶ 150-151.

legally required to have provided a final decision on his claim.[19]  SMF ¶¶ 69, 146-

151.  Morever, Mr. Miller's appeal was not actually decided until May 22, 2007 –

nearly 6 months (and more than 170 days) after the filing of Mr. Miller's appeal.

SMF ¶¶ 60, 93.  Thus, Defendants plainly violated both the ERISA claims

regulations and their own claims procedures in the processing of Mr. Miller's

appeal.

   Defendants also violated ERISA claims regulations in their handling of

Mr. Miller's post-appeal requests for information.  Under ERISA's claims

regulations, Defendants are required, upon request, to provide claimants with "all

documents, records, and other information relevant to the claimant's claim for

benefits."  29 C.F.R. § 2560.503-1(j)(3).  "Relevant" is further defined to include

any document, record, or other information that "[w]as relied upon in making the

benefit determination" or "[w]as submitted, considered, or generated in the course

of making the benefit determination...".  29 C.F.R. § 2560.503-1(m)(8).  Despite

_____

19.   In view of the fact that the WME report was not even requested until after
      the legal deadline for ruling on Mr. Miller's appeal, this Court should reject
      Defendants' efforts to rely on it as a basis for the termination of Mr. Miller's
      benefits.  Just as this Court would not countenance efforts by an ERISA
      Plaintiff to rely on materials submitted after the proper deadline for
      administrative appeal, it should not permit a Plan to rely in its determination
      on materials first solicited only after it was legally mandated to respond.
      See generally 29 C.F.R. § 2560.503-1(l) (indicating that a failure to follow
      ERISA's claims regulations – including ERISA's time limitations – results
      in a deemed denial of benefits, requiring no further exhaustion of remedies).

Mr. Miller's express requests for all "relevant" documents and information – and

Defendants express representations that all such documents were in fact provided

– American in fact withheld <u>the only</u> document that was reviewed or relied on in

rendering a determination on Mr. Miller's appeal.  SMF ¶¶ 101-104.  Although

American has never articulated a justification for its failure to produce this

document, it is notable that the withheld document reveals that Mr. Miller's appeal

was not, in fact, considered or decided by the PBAC, as represented in the appeal

denial letter he received.  SMF ¶ 105.

> ### iii.   Defendants' Determination Was Substantively Arbitrary and Capricious

For the forgoing reasons alone, Defendants termination of Mr. Miller's

benefits must be found to be arbitrary and capricious.  However, this Court need

not rely solely on the significant procedural errors and structural conflict of

interest in this case, as Defendants' denial of Mr. Miller's appeal was also

substantively arbitrary and capricious.[20]  As set forth below, the report submitted

by Western Medical Evaluators was riddled with inadequacies and errors, which

Defendants adopted wholesale into their appeal determination.  Among other

---

20.   Some of the procedural irregularities described *supra* – including most
notably Defendants' utterly unexplained reversal of position as to whether
Mr. Miller's diagnosis and treatment qualified him for benefits – can also be
properly characterized as "substantive."  In order to avoid repetition, these
irregularities are not repeated herein.

things, the WME report (and American's appeal denial letter): 1) fail entirely to address one of Mr. Miller's diagnoses; 2) never address the actual requirements of Mr. Miller's job; and 3) determine that Mr. Miller is ineligible for benefits on the basis of criteria that are not valid bases for termination under the Plan.  In view of these patent defects, Defendants' determination was arbitrary and capricious and must be reversed.

### a.     Failure to Address Mr. Miller's Diagnosis With Anxiety Disorder NOS

All of the documentation submitted in support of Mr. Miller's appeal clearly indicated that – in addition to his psychotic break in 1998 – he continued in 2006 to have a current diagnosis of Anxiety Disorder NOS.  SMF ¶ 67.  And indeed, neither the WME report nor American's termination letter disputes that Mr. Miller had such a diagnosis.  SMF ¶¶ 77, 96.   Instead, both documents utterly ignore Mr. Miller's Anxiety Disorder NOS diagnosis, instead focusing exclusively on Mr. Miller's 1998 psychotic episode.  SMF ¶¶ 75-78, 94-96.  For this reason alone, Defendants' determination was arbitrary and capricious and must be reversed.[21]  *See, e.g., Kosiba v. Merck*, 384 F.3d 58, 68-69 (3d Cir. 2004) (noting

---

21.    Even had American endeavored to address this issue, it would have been arbitrary and capricious for American to conclude that Mr. Miller lacked a current diagnosis of Anxiety Disorder NOS, in view of the uncontested evidence in the record.  SMF ¶ 67.

the importance of addressing *each* of a claimant's diagnoses, and noting that the

Defendant's determination would have to be reversed if the expert on which they

relied did not adequately address any of those diagnoses).

>   **b.      Failure to Consider Mr. Miller's Medical Treatment
>            and Reliance on an Erroneous Standard**

The undisputed evidence also established that Mr. Miller continued to be

seen regularly by Dr. Gonzalez at the time of the termination of his benefits, and

that Dr. Gonzalez continued to monitor Mr. Miller's implementation of stress

management and sleep hygiene measures.  SMF ¶ 68.  Perhaps unsurprisingly,

given American and WME's failure to address Mr. Miller's Anxiety Disorder

diagnosis, neither American's termination letter nor WME's report addresses this

psychiatric treatment in any detail, or discusses whether it is in fact appropriate

medical treatment for Anxiety Disorder NOS.  SMF ¶¶ 79-80, 96.  In fact, it is

well-established that both stress management and sleep hygiene are appropriate

treatments for anxiety disorders.[22]  SMF ¶ 81.  Thus, American's termination

---

22.   American's October 2006 termination letter gave Mr. Miller no notice that
      the adequacy of his medical treatment might be under consideration.  SMF
      ¶¶ 43-44.  In view of the fact that that treatment had been deemed adequate
      for literally years prior to the termination of benefits, SMF ¶¶ 12-26, 36, any
      reliance on this issue on appeal was clear error.  *See, e.g., Cook v. New York
      Times Co. Long Term Disability Plan*, No. 02 Civ. 9154, 2004 WL 203111,
      *7 (S.D.N.Y. Jan. 30, 2004) (noting that "[t]he adequacy of the notice
      provided [to the Plaintiff] must be judged in the context of the
      determination that follows it," and finding that reliance on issues on appeal

decision – which determined that the evidence "does not document continued appropriate medical care and treatment for a condition giving rise to a disability" was arbitrary and capricious, insofar as it: 1) ignored the undisputed evidence that Mr. Miller was, in fact, receiving psychiatric care; and 2) failed to even address the issue of whether the care Mr. Miller was receiving was appropriate for his psychiatric disorders. *See, e.g., Rosen v. Provident Life and Accident Ins. Co.*, No. 02-591, 2003 WL 22254805, *9-10 (E.D. Pa. 2003) (finding termination of benefits to be arbitrary and capricious based in part on a failure to adequately address certain material evidence).

Moreover – even had American adequately addressed this issue – it is plain that it applied an erroneous standard to the question of whether Mr. Miller's medical care was sufficient to support an award of continued benefits. Under the terms of the Plan, a termination based on lack of treatment is *only* appropriate where a Pilot "[w]antonly disregards appropriate medical care."[23]  SMF ¶ 134; *see*

---

of which the Plaintiff did not have clear prior notice was arbitrary and capricious); *see also Abram v. Cargill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005).

23. This standard is the <u>only</u> medical care related standard that appears in the SPD section prominently titled "When Disability Benefits End."  SMF ¶ 134.  Despite this fact, Plaintiff anticipates that Defendants will contend that a separate standard, set forth in an entirely different section of the SPD also provides a basis for terminating benefits.  This standard – which provides that "a pilot must continue to receive qualified medical care consistent with

*also* SMF ¶¶ 133-136.  This clearly was not the standard applied by American, and indeed, American has conceded that Plaintiff's benefits were not "terminated in whole or in part because Plaintiff wantonly disregarded appropriate medical care." SMF ¶ 94, 137-38.  Thus, American's determination is independently arbitrary and capricious because it applied an erroneous standard under the Plan, and because there is no dispute that Mr. Miller did not meet the actual Plan standard for termination.  *See, e.g., Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 443 (3d Cir. 1997) (holding that it is arbitrary and capricious for the Plan Administrator to apply a more stringent standard than what is actually set forth under the terms of the Plan).

---

the nature of the illness or injury that resulted in the Disability" – is plainly not listed as an independent basis for terminating benefits, and indeed testimony of American witnesses confirms that it was not understood by American staff as providing a basis for termination independently of the "wanton disregard" standard.   SMF ¶¶ 134-36.  As noted, *supra* Section IV.A.i, the Court must review this issue *de novo*.  *Cf. Miles v. New York State Teamsters Conference Pension & Retirement Fund*, 698 F.2d 593, 599 (2d Cir. 1983) (where, as here, the Defendants' proposed interpretation would render certain Plan language superfluous, that interpretation should be found to be arbitrary and capricious).  Moreover, all ambiguities in the Plan should be construed in Mr. Miller's favor, in accordance with the well-established doctrine of *contra preferentum*.  *See, e.g., Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257-58 (3d Cir. 1993).

### c.    Failure to Address the Requirements of Mr. Miller's Job

The Plan under which Mr. Miller receives benefits is an "own occupation"
Plan, meaning that Mr. Miller is entitled to benefits if any of his psychiatric
conditions render him incapable of serving as commercial airline pilot for
American.  SMF ¶¶ 128-29.  Thus, the actual requirements of Mr. Miller's position
are obviously relevant to the determination of whether he continued to be disabled
under the terms of the Plan.  SMF ¶¶ 85, 128-29.  As discussed, *supra*, those
requirements include numerous criteria that are patently inconsistent with any
clinically significant level of anxiety.  *See* Section II, *supra*.  Despite the obvious
salience of these job requirements to the determination of whether Mr. Miller is in
fact disabled, the job requirements for a commercial airline pilot are never *once*
mentioned in either the WME report, or Defendants' appeal determination letter.
SMF ¶¶ 82-84, 96; *see also* SMF ¶¶ 85, 128-29.  Failure to consider these job
requirements is arbitrary and capricious, and requires reversal of the Defendants'
determination.  *See, e.g., Witte v. Connecticut General Life Ins. Co.*, No. 06-2755,
2007 WL 4300224, *4-6 (D.N.J. Dec. 6, 2007).

### d.    Reliance on Failure to Apply for FAA Certification

As discussed, *supra*, failure to apply for FAA recertification is <u>not</u> a basis for terminating benefits under the American disability Plan.[24]  SMF ¶¶ 130-32. Nevertheless, the WME report, and American's termination letter, focused extensively – and negatively – on Mr. Miller's failure to reapply for FAA certification.  SMF ¶¶ 86, 94.  As decisions of the Third Circuit make clear, this reliance on a criteria not expressly set forth in the Plan constituted clear error. *See, e.g., Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 443 (3d Cir. 1997); *see also Harrison v. Prudential Ins. Co.*, 543 F.Supp.2d 411, 423-24 (E.D. Pa. 2008) (reliance on terms not set forth in a Plan seriously calls into question the Administrator's neutrality).

## V.    <u>CONCLUSIONS</u>

For all of the forgoing reasons, Defendants' termination of Mr. Miller's disability benefits was arbitrary and capricious and must be reversed. Accordingly, Plaintiff requests that this Court vacate the Defendants' termination decision, and order the full restoration of Mr. Miller's benefits (with back benefits

---

24.    As discussed *supra* note 23, to the extent that Defendants' contend – contrary to the testimony of their own witnesses – that a failure to seek FAA recertificication *is* a proper consideration under the terms of the Plan, this Court must address this question *de novo*, construing all ambiguities against American.

plus interest dating from the date of termination).  Mr. Miller also respectfully

reserves the right to file a petition for attorneys' fees.

Respectfully submitted,

/s/ Katie R. Eyer
Katie R. Eyer - ID. 200756
Michael J. Salmanson - I.D.  46707
SALMANSON GOLDSHAW, P.C.
Two Penn Center
1500 J.F.K. Blvd., Suite 1230
Philadelphia, PA  19102
215-640-0593
215-640-0596 (fax)

Date:  December 8, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT T. MILLER | : | |
| | : | Civ. Action No. |
| v. | : | |
| | : | 08 - cv - 0277 |
| AMERICAN AIRLINES, INC., | : | |
| and | : | Judge Caputo |
| AMERICAN AIRLINES, INC. PILOT | : | Magistrate Judge Blewitt |
| RETIREMENT BENEFIT PROGRAM | : | |
| FIXED INCOME PLAN (A PLAN) | : | |
| and | : | |
| AMERICAN AIRLINES, INC. PENSION | : | |
| BENEFITS ADMINISTRATION | : | |
| COMMITTEE | : | |
| _____ | : | |

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8

This brief complies with the word-count requirement set forth in local rule 7.8.  According to the word count feature of WordPerfect, the instant brief includes 9,984 words (excluding the Table of Contents and Table of Authorities), which is in accordance with the expanded word count permitted by Judge Blewitt's 11/18/08 Order.

By:___/s/ Katie R. Eyer_____
        Katie R. Eyer - ID. 200756

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT T. MILLER | : | |
| | : | Civ. Action No. |
| v. | : | |
| | : | 08 - cv - 0277 |
| AMERICAN AIRLINES, INC., | : | |
|    and | : | Judge Caputo |
| AMERICAN AIRLINES, INC. PILOT | : | Magistrate Judge Blewitt |
| RETIREMENT BENEFIT PROGRAM | : | |
| FIXED INCOME PLAN (A PLAN) | : | |
|    and | : | |
| AMERICAN AIRLINES, INC. PENSION | : | |
| BENEFITS ADMINISTRATION | : | **CERTIFICATE OF SERVICE** |
| COMMITTEE | : | |
| _____ | : | |

I hereby certify that on December 8, 2008, I caused a true and correct copy of the foregoing Memorandum of Law to be filed via the Official Court Electronic Document Filing System, and that said Memorandum is therefore available for viewing and downloading from the ECF system.  By virtue of this filing, service of the Memorandum upon the following counsel is complete upon counsels' receipt of the Court's e-mail notification of the Notice of Electronic Filing:

> Donald L. Havermann
> Jonathan S. Krause
> Michael Puma
> Justin O. Reliford

Copies of matter redacted in the electronic version of the foregoing Memorandum were also filed with the Court by Federal Express on this date, and served on the forgoing counsel by Federal Express at the below addresses:

> Michael J. Puma
> Justin O Reliford
> Jonathan S. Krause
> Morgan Lewis & Bockius LLP
> 1701 Market Street
> Philadelphia, PA 19103
>
> Donald L. Havermann
> Morgan, Lewis & Bockius LLP
> 1111 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004

By:___/s/ Katie R. Eyer_____
     Katie R. Eyer - ID. 200756