**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**


ROBERT T. MILLER               :
                                :    Civ. Action No.
     v.                         :
                                :    08 - cv - 0277
AMERICAN AIRLINES, INC.,     :
     and                     :    Judge Caputo
AMERICAN AIRLINES, INC. PILOT  :    Magistrate Judge Blewitt
RETIREMENT BENEFIT PROGRAM  :
FIXED INCOME PLAN (A PLAN)    :
     and                     :
AMERICAN AIRLINES, INC. PENSION  :
BENEFITS ADMINISTRATION       :
COMMITTEE                   :
_____ :


**PLAINTIFF ROBERT MILLER'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE**


      Plaintiff Robert Miller, by his counsel, hereby submits the following

Statement of Material Facts Not in Dispute:


**I.     GENERAL FACTS**


1.     Plaintiff Robert Miller was employed as a commercial airline pilot by
American Airlines, Inc. from 1989 through August 1998.[1]  *See* Exhibit 61

---

1.     Numbered exhibits are numbered in accordance with the numbering that
was used by Plaintiff for exhibits in all depositions in this case, for ease of
reference.  Letters are used to refer to exhibits that were not marked during
depositions in this case.

(Excerpts from Defendants' Objections and Responses to Plaintiffs' First Requests for Admissions (hereinafter "Admissions")), ¶ 1.

2. In August 1998, Mr. Miller's mental state became unstable while he was co-piloting a plane. *See* Exhibit 51 (Amended Complaint), ¶ 10; Exhibit 52 (Answer to Amended Complaint), ¶ 10; Exhibit 59 (Miller Appeal Packet) at AA 737.

3. As a result of Mr. Miller's unstable mental state, the plane he was co-piloting had to be taxied back to the terminal. *See* Exhibit 51 (Amended Complaint), ¶ 10; Exhibit 52 (Answer to Amended Complaint), ¶ 10; Exhibit 59 (Miller Appeal Packet) at AA 737.

4. Mr. Miller was removed from the plane and committed to a psychiatric hospital. *See* Exhibit 18 (Misc Medical Records) at AA 789; Exhibit 31 (8/20/98 Dzialakiewicz Email); Exhibit 37 (10/2/98 Yinnaou Email); Exhibit 59 (Miller Appeal Packet) at AA 737.

5. In the hospital, Mr. Miller was diagnosed with "severe psychosis." *See* Exhibit 18 (Misc Medical Records) at AA 789; *see also* Exhibit 59 (Miller Appeal Packet) at AA 737.

6. Following Mr. Miller's discharge from the hospital, he was treated by Dr. Abel Gonzalez. *See* Exhibit 59 (Miller Appeal Packet) at AA 738.

7. Dr. Gonzalez diagnosed Mr. Miller with Anxiety Disorder, NOS, R/O Generalized Anxiety Disorder With Soft Obsessive Compulsive Features and S/P (Status Post) Brief Reactive Psychosis. *See* Exhibit 59 (Miller Appeal Packet) at AA 738.

8. As a result of Mr. Miller's psychiatric conditions, and his resulting inability to act as a pilot, American awarded Mr. Miller long term disability benefits in 1999. *See* Exhibit 49 (11/22/99 Disability Benefits Letter) at AA 1058.

9. From 1999 through 2003, Mr. Miller continued to receive long term disability benefits. *See* Exhibit 49 (11/22/99 Disability Benefits Letter); Exhibit 2 (PDQ Pilot Disability Case Management Notes (hereinafter "Case

Management Notes")) at AA 756; *see also* Exhibit A (Excerpts from Dr. Thomas Bettes Deposition (hereinafter "Bettes Dep.")) at 331:4-15.

10.     In 2003, Mr. Miller's long term disability benefits were terminated, after American[2] instated a disability management program, and experienced certain difficulties in contacting Mr. Miller for information. *See* Exhibit 2 (Case Management Notes) at AA 756-57; Exhibit B (Excerpts from Jeanne Spoon Deposition (hereinafter "Spoon Dep.")) at 13:12-21; 28:17-29:25; Exhibit 3 (2/10/03 Letter from AA to Miller).

11.     After the termination of his benefits in 2003, Mr. Miller contacted American seeking reinstatement. *See* Exhibit 2 (Case Management Notes) at AA 757; Exhibit 61 (Admissions), ¶ 8; Exhibit B (Spoon Dep.) at 69:15-20.

12.     Mr. Miller had a conversation with Ms. Spoon (American's Nurse Case Manager) on May 22, 2003, in which she advised Mr. Miller that he needed to submit medical documentation in order for his benefits to be reinstated. *See* Exhibit 2 (Case Management Notes) at AA 757.

13.     Ms. Spoon's notes following the conversation indicated the following Plan: "Obtain med, review, notify pensions if med. adeq. to support continued medical disability." *See* Exhibit 2 (Case Management Notes) at AA 757; *see also* Exhibit B (Spoon Dep.) at 70:17-71:24.

14.     Mr. Miller and Ms. Spoon again spoke on June 5, 2003. *See* Exhibit 2 (Case Management Notes) at AA 757; *see also* Exhibit B (Spoon Dep.) at 30:19-31:25.

15.     At that time, Ms. Spoon informed Mr. Miller that his disability payments depended on physician documentation of a medical disability. *See* Exhibit 2 (Case Management Notes) at AA 757; *see also* Exhibit B (Spoon Dep.) at 72:5-18.

16.     Ms. Spoon's notes following the conversation indicated the following Plan: "Review medical when receive, - MRB determine if documentation

---

2.     "American" is used to refer to all three Defendants in the instant litigation, except where it is relevant to specifically distinguish between the three.

substantiates medical disability." *See* Exhibit 2 (Case Management Notes) at AA 757.

17. Following Mr. Miller's conversations with Ms. Spoon, but prior to the reinstatement of Mr. Miller's benefits, Dr. Gonzalez submitted a number of medical records to American. *See* Exhibit 2 (Case Management Notes) at AA 757-758; *see also* Exhibit 6 (6/10/03 Letter from Dr. Gonzalez to AA); Exhibit 7 (Gonzalez Initial Psychiatric Assessment); Exhibit 8 (Gonzalez 2002 Progress Notes); Exhibit 9 (Gonzalez 2003 Progress Notes).

18. The records submitted by Dr. Gonzalez indicated that Mr. Miller continued to be diagnosed with Anxiety Disorder NOS and Status Post Brief Reactive Psychosis, and to be seen regularly by Dr. Gonzalez. *See* Exhibit 2 (Case Management Notes) at AA 757-58; *see also* Exhibit 8 (Gonzalez 2002 Progress Notes); Exhibit 9 (Gonzalez 2003 Progress Notes).

19. The records submitted by Dr. Gonzalez were reviewed by Dr. Bettes (American's Corporate Medical Director) or Dr. Beaty (one of American's Area Medical Directors). *See* Exhibit 2 (Case Management Notes) at AA 757-758; Exhibit A (Bettes Dep.) at 17:18-18:3, 55:4-56:1; Exhibit B (Spoon Dep.) at 85:19-86:23; 87:22-89:16.

20. Mr. Miller's benefits were retroactively reinstated by Dr. Beaty on July 15, 2003. *See* Exhibit 19 (AA Request for Disability Pension); Exhibit 2 (Case Management Notes) at AA 758; Exhibit 47 (AA Request for Disability Pension With Notations).

21. At that time, Dr. Beaty verified that Mr. Miller "[m]edically qualifies for [the] disability pension program." *See* Exhibit 19 (AA Request for Disability Pension); *see also* Exhibit B (Spoon Dep.) at 101:20-103:16, 207:22-209:2, 209:24-210:8, 210:21-211:13; Exhibit A (Bettes Dep.) at 274:15-277:4.

22. Dr. Gonzalez submitted records to American documenting Mr. Miller's psychiatric status and treatment during the next two years following the reinstatement of Mr. Miller's benefits. *See* Exhibit 2 (Case Management Notes) at AA 758-59; *see also* Exhibit 10 (Letter from Dr. Gonzalez to AA, Noted 3/29/04); Exhibit 11 (Note from Dr. Gonzalez to AA, Noted

12/21/04); Exhibit 12 (8/26/05 Letter from Dr. Gonzalez to AA); Exhibit 13 (Gonzalez 2006 Progress Notes).

23. The records submitted by Dr. Gonzalez were reviewed by Dr. Wolbrink (one of American's Area Medical Directors) or Dr. Bettes (American's Corporate Medical Director). *See* Exhibit 2 (Case Management Notes) at AA 758-759; *see also* Exhibit A (Bettes Dep.) at 17:18-18:3; Exhibit C (Excerpts from Dr. Alex Wolbrink Deposition (hereinafter "Wolbrink Dep.")) at 14:18-21; Exhibit B (Spoon Dep.) at 109:25-113:25.

24. During this time frame, Mr. Miller's psychiatric condition and treatment remained constant. *See* Exhibit D (Excerpts from Defendants' Supplemental Objections and Responses to Plaintiff's First and Second Set of Interrogatories (hereinafter "Defendants' Supp. Interrogatory Responses"), #7; *see also* Exhibit 6 (6/10/03 Letter from Dr. Gonzalez to AA); Exhibit 7 (Gonzalez Initial Psychiatric Assessment); Exhibit 8 (Gonzalez 2002 Progress Notes); Exhibit 9 (Gonzelez 2003 Progress Notes); Exhibit 10 (Letter from Dr. Gonzalez to AA, Noted 3/29/04); Exhibit 11 (Note from Dr. Gonzalez to AA, Noted 12/21/04); Exhibit 12 (8/26/05 Letter from Dr. Gonzalez to AA); Exhibit 13 (Gonzalez 2006 Progress Notes).

25. During this time frame, American determined on at least two occasions that Mr. Miller continued to qualify for disability benefits. *See* Exhibit 2 (Case Management Notes) at AA 758-759; *see also* Exhibit A (Bettes Dep.) at 331:4-15.

26. At least two American employees stated in 2004 that they did not believe that Mr. Miller would return to work. *See* Exhibit 2 (Case Management Notes) at AA 759; Exhibit B (Spoon Dep.) at 114:25-115:25, 133:7-10.

27. In August 2005, Dr. Gonzalez submitted a letter indicating that Mr. Miller continued to be seen regularly. *See* Exhibit 2 (Case Management Notes) at AA 759; Exhibit 12 (8/26/05 Letter from Dr. Gonzalez to AA).

28. Dr. Gonzalez's August 2005 letter was reviewed by Dr. Wolbrink (one of American's Area Medical Directors) in conjunction with Ms. Spoon. *See*

Exhibit 2 (Case Management Notes) at AA 759; *see also* Exhibit C (Wolbrink Dep.)) at 14:18-21.

29. It was determined that authorization should be requested to submit Mr. Miller's case to the FAA for medical certification, and/or that Mr. Miller's case should be submitted to AMAS. *See* Exhibit 2 (Case Management Notes) at AA 759-760.

30. AMAS is an entity that works with pilots to facilitate the FAA certification process. *See* Exhibit B (Spoon Dep.) at 154:9-19.

31. Prior to the termination of Mr. Miller's benefits, American did not request that Mr. Miller reapply for FAA medical certification. *See* Exhibit 2 (Case Management Notes) at AA 759-60; *see also* Exhibit B (Spoon Dep.) at 30:21-31:25, 44:23-45:15.

32. Prior to the termination of Mr. Miller's benefits, American did not request that Mr. Miller submit his information to AMAS. *See* Exhibit 2 (Case Management Notes) at AA 759-60; *see also* Exhibit B (Spoon Dep.) at 30:21-31:25, 44:23-45:15.

33. Ms. Spoon did attempt to contact Mr. Miller by phone on three dates, but received a busy signal. *See* Exhibit 2 (Case Management Notes) at AA 760.

34. Prior to the termination of Mr. Miller's benefits, no attempts were made to advise Mr. Miller by mail that he should reapply for FAA medical certification and/or that he should submit his information to AMAS. *See* Exhibit 2 (Case Management Notes) at AA 760; *see also* Exhibit B (Spoon Dep.) at 30:21-31:25, 44:23-45:15.

35. Mr. Miller's disability benefits were terminated without prior warning in October 2006. *See* Exhibit 1 (October 2006 Termination Letter); *see also* Exhibit 2 (Case Management Notes) at AA 760.

36. At the time Mr. Miller's benefits were terminated, his psychiatric condition, diagnosis and treatment had remained unchanged since at least January 2003. *See* Exhibit D (Defendants' Supp. Interrogatory Responses), #7; *see also* Exhibit 6 (6/10/03 Letter from Dr. Gonzalez to AA); Exhibit 8

(Gonzalez 2002 Progress Notes); Exhibit 9 (Gonzelez 2003 Progress Notes); Exhibit 10 (Letter from Dr. Gonzalez to AA, Noted 3/29/04); Exhibit 11 (Note from Dr. Gonzalez to AA, Noted 12/21/04); Exhibit 12 (8/26/05 Letter from Dr. Gonzalez to AA); Exhibit 13 (Gonzalez 2006 Progress Notes).

a) Defendants have stated in their responses to interrogatories that "Defendants cannot determine from the medical documentation produced by Plaintiff and his treating physician whether there was any change that occurred in Plaintiff's psychiatric condition or treatment" between January 2003 and May 2007. *See* Exhibit D (Defendants' Supp. Interrogatory Responses), #7.

b) Dr. Bettes could not identify any changes to Mr. Miller's psychiatric condition or treatment that may have influenced his determination to terminate Mr. Miller's benefits. *See* Exhibit A (Bettes Dep.) at 79:25-81:16, 82:12-83:1, 137:1-17, 260:20-261:2, 328:23-329:6; *see also* Exhibit 1 (October 2006 Termination Letter).

c) Ms. Teklitz could not identify any changes to Mr. Miller's psychiatric condition or treatment that may have influenced her determination to uphold the termination of Mr. Miller's benefits. *See* Exhibit E (Excerpts from Charlotte Teklitz Deposition (hereinafter "Teklitz Dep.") at 155:22-156:9, 280:18-282:14.

37. The decision to terminate Mr. Miller's disability benefits was made by Dr. Thomas Bettes, American Airlines' Medical and Occupational Health Services Department ("AAMOHS")'s chief officer. *See* Exhibit 2 (Case Management Notes at AA 760); Exhibit A (Bettes Dep.) at 17:18-25, 73:17-22, 79:25-80:4; Exhibit B (Spoon Dep.) at 27:2-19.

38. The October 2006 termination letter provided no explanation of why American's assessment of Mr. Miller's eligibility for disability benefits had changed. *See* Exhibit 1 (October 2006 Termination Letter).

39. American has not, to date, provided any explanation of why its assessment of Mr. Miller's eligibility for disability benefits changed. *See* Exhibit 1 (October 2006 Termination Letter); *see also* Paragraphs 51-56, *infra*.

40.   The reasons stated for the termination of Mr. Miller's disability benefits in the October 2006 termination letter were as follows: "...[w]e are unable to verify either the existence of a continuing medical disability or your continued substantial progress towards obtaining your FAA medical certification....". *See* Exhibit 1 (October 2006 Termination Letter).

41.   No information was provided in the October 2006 termination letter regarding what, if any, alleged deficiencies contributed to American's inability to "verify the existence of a continuing medical disability." *See* Exhibit 1 (October 2006 Termination Letter).

42.   No information was provided in the October 2006 termination letter regarding why progress towards obtaining FAA medical certification was relevant to Mr. Miller's continued receipt of benefits. *See* Exhibit 1 (October 2006 Termination Letter).

43.   The October 2006 termination letter did not identify any deficiencies in Mr. Miller's medical treatment or care. *See* Exhibit 1 (October 2006 Termination Letter).

44.   Indeed, the October 2006 termination letter gave no indication that the medical care Mr. Miller was receiving (or not receiving) contributed in any way to the decision to terminate his benefits. *See* Exhibit 1 (October 2006 Termination Letter).

45.   The only guidance provided in the October 2006 termination letter regarding how Mr. Miller might reverse the benefits termination decision was as follows: "In order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing obtaining your FAA medical certification." *See* Exhibit 1 (October 2006 Termination Letter).

46.   The October 2006 termination letter also quoted from several provisions of the American Plan, without indicating whether those provisions had, in fact, formed a basis for the termination of Mr. Miller's benefits. *See* Exhibit 1 (October 2006 Termination Letter).

47. The October 2006 termination letter is based on a form letter. *See* Exhibit A (Bettes Dep.) at 37:25-38:12, 50:12-23, 121:11-18; *see also* Exhibit 1 (October 2006 Termination Letter).

48. It is American's standard practice to use a form termination letter in terminating pilots' benefits. *See* Exhibit A (Bettes Dep.) at 37:25-38:12; 50:12-23.

49. The only portion of the October 2006 termination that was identified by Dr. Bettes as <u>not</u> being based on form letter language is the portion of the October 2006 letter dealing with FAA medical certification. *See* Exhibit A (Bettes Dep.) at 122:6-123:3.

50. Dr. Bettes repeatedly testified that he could not determine the precise bases for the termination of Mr. Miller's benefits on the basis of the information appearing in the October 2006 letter. *See* Exhibit A (Bettes Dep.) at 123:11-125:12, 134:14-135:24, 136:15-137:17, 258:25-261:20.

51. Mr. Miller contacted American on November 7, 2006 to obtain further information about the reasons for the termination of his benefits. *See* Exhibit 2 (Case Management Notes) at AA 760; Exhibit B (Spoon Dep.) at 171:15-172:12; Exhibit 15 (11/7/06 Spoon Email and 11/10/06 Bettes Emails).

52. At that time, Mr. Miller informed Ms. Spoon that "there was no reason given for stopping benefits." *See* Exhibit 15 (11/7/06 Spoon Email and 11/10/06 Bettes Emails); *see also* Exhibit 2 (Case Management Notes) at 760; Exhibit B (Spoon Dep.) at 171:15-172:12; Exhibit 61 (Admissions), ¶ 12.

53. Ms. Spoon nonetheless did not provide Mr. Miller with further information, and instead referred him to the termination letter. *See* Exhibit 15 (11/7/06 Spoon Email and 11/10/06 Bettes Emails); *see also* Exhibit 2 (Case Management Notes) at 760; Exhibit B (Spoon Dep.) at 176:11-177:2.

54. Ms. Spoon subsequently emailed Dr. Bettes about Mr. Miller's call. *See* Exhibit 15 (11/7/06 Spoon Email and 11/10/06 Bettes Emails).

55. Dr. Bettes responded that "I have reviewed the file and documentation and feel that we have fulfilled our obligation under ERISA." *See* Exhibit 15 (11/7/06 Spoon Email and 11/10/06 Bettes Emails).

56. No further information explaining the reasons for the termination of Mr. Miller's benefits in 2006 was in fact provided to Mr. Miller. *See* Exhibit 61 (Admissions), ¶ 14; Exhibit D (Defendants' Supp. Interrogatory Responses, #10; Exhibit 53 (Original Complaint), ¶ 24; *see also* Exhibit 59 (Miller Appeal Packet) at AA 737.

57. Dr. Bettes testified that it is AAMOHS's standard practice to refuse to provide pilots with further information beyond the termination letter, where AAMOHS is contacted by pilots seeking further information. See Exhibit A (Bettes Dep.) at 58:22-60:6.

58. Ms. Spoon testified that it is her standard practice to refuse to provide pilots with further information beyond the termination letter, where she is contacted by pilots seeking further information. *See* Exhibit B (Spoon Dep.) at 21:14-22:7, 176:11-177:2.

59. Dr. Bettes testified that the fact that a pilot's alleged disability was psychiatric in nature would not affect his decision whether or not to provide them with further information about the reasons for the termination of their benefits because, "we are talking about a population of airline pilots – so, in most cases it's assumed that they can understand documentation that's written to them." *See* Exhibit A (Bettes Dep.) at 117:12-118:5.

60. Mr. Miller filed an appeal of the termination of his disability benefits with the Pension Benefits Administration Committee ("PBAC") on November 30, 2006. *See* Exhibit 59 (Miller Appeal Packet) at AA 733.

61. Mr. Miller submitted a letter from Dr. Gonzalez in support of his appeal. *See* Exhibit 59 (Miller Appeal Packet) at AA 736-739.

62. Dr. Gonzalez's letter indicated that Mr. Miller continued to be diagnosed with Anxiety Disorder NOS, R/O Generalized Anxiety Disorder With Soft Obsessive Compulsive Features and S/P (Status Post) Brief Reactive Psychosis. *See* Exhibit 59 (Miller Appeal Packet) at AA 738.

63.    Dr. Gonzalez's letter also indicated that Mr. Miller continued to undergo active medical treatments supervised by Dr. Gonzalez in the form of stress management techniques and sleep hygiene measures. *See* Exhibit 59 (Miller Appeal Packet) at AA 738-739.

64.    Dr. Gonzalez's letter also indicated that Mr. Miller's mental illness was "permanent" and disqualified Mr. Miller from obtaining FAA medical certification. *See* Exhibit 59 (Miller Appeal Packet) at AA 736.

65.    Mr. Miller also submitted a statement on his own behalf, which reiterated his continued anxiety disorder and history of psychosis. *See* Exhibit 59 (Miller Appeal Packet) at AA 734-35.

66.    Mr. Miller's statement also indicated that he was unable to obtain an "airman medical certificate" due to "psychosis and a general anxiety disorder." *See* Exhibit 59 (Miller Appeal Packet) at AA 735.

67.    All of the documentation submitted in support of Mr. Miller's appeal indicated that – in addition to his psychotic break in 1998 – he continued in 2006 to have a current diagnosis of Anxiety Disorder NOS. *See* Exhibit 59 (Miller Appeal Packet).

68.    The documentation submitted in support of Mr. Miller's appeal also clearly established that Mr. Miller continued to be seen regularly by Dr. Gonzalez at the time of the termination of his benefits, and that Dr. Gonzalez continued to monitor Mr. Miller's implementation of stress management and sleep hygiene measures. *See* Exhibit 59 (Miller Appeal Packet).

69.    On March 27, 2007, a request was sent by American to an outside medical evaluator, Western Medical Evaluators (WME) to review Mr. Miller's appeal. *See* Exhibit 55 (Request for WME Review) at AA 806.

70.    WME was asked by American to address whether Mr. Miller continued to have a psychiatric diagnosis, and if so, what treatment would be medically appropriate for that diagnosis. *See* Exhibit 55 (Request for WME Review) at AA 807.

71.     Ms. Charlotte Teklitz, the individual responsible for deciding Mr. Miller's appeal, testified that these questions were intended to "obtain the information that [she] would need as a delegate of the PBAC to determine whether or not the pilot's disability continues or whether or not [the pilot has] wantonly disregarded appropriate medical care." *See* Exhibit E (Teklitz Dep.) at 89:18-90:10; *see also* Paragraph 99, *infra*.

72.     WME was provided with a number of documents to perform their review, including: a) Mr. Miller's appeal submission; b) American's "Job Description and Essential Functions" for Mr. Miller's position; c) the medical records maintained by AAMOHS; and d) potentially relevant provisions of the American Plan. *See* Exhibit 55 (Request for WME Review) at AA 806; Exhibit D (Defendants' Supp. Interrogatory Responses), #17.

73.     WME did not conduct an in-person or telephone evaluation of Mr. Miller. *See* Exhibit D (Defendants' Supp. Interrogatory Responses), #17; Exhibit E (Teklitz Dep.) at 86:19-87:17; Exhibit 61 (Admissions), ¶ 20.

74.     WME's report was provided to American on April 20, 2007. *See* Exhibit 56 (WME Report) at AA 812.

75.     WME's report did not address whether Mr. Miller continued to have a current psychiatric diagnosis. *See* Exhibit 56 (WME Report).

76.     Mr. Miller's Anxiety Disorder NOS was not mentioned in the WME report, except in a section titled "Review of Documents." *See* Exhibit 56 (WME Report).

77.     Neither WME reviewer indicated that they disagreed with Mr. Miller's diagnosis of Anxiety Disorder NOS. *See* Exhibit 56 (WME Report).

78.     Both WME reviewers focused exclusively on Mr. Miller's 1998 psychotic episode, without addressing his continuing Anxiety Disorder. *See* Exhibit 56 (WME Report) at 815-17 (exclusively addressing Mr. Miller's psychotic episode, and not addressing Mr. Miller's anxiety disorder); *see generally* Exhibit 56 (WME Report) (nowhere referencing the diagnostic criteria for

Anxiety Disorder NOS and nowhere expressing disagreement with Anxiety Disorder NOS diagnosis).

79. The WME report did not address what medical care is appropriate for Anxiety Disorder, NOS. *See* Exhibit 56 (WME Report).

80. The WME report also did not address whether the medical care that Mr. Miller was receiving was "consistent with" Anxiety Disorder NOS. *See* Exhibit 56 (WME Report).

81. Stress management and sleep hygiene are both recognized as appropriate treatments for anxiety disorders. *See* Exhibit F (Shearer Article) at 489-90; Exhibit G (Mellman Article) at 1047-1049, 1053; Exhibit H (Jacobson Article) at Ch. 16, #9, Ch. 46, #10-11, 15.

82. The WME Report did not address or even mention the qualifications for serving as a commercial airline pilot. *See* Exhibit 56 (WME Report).

83. According to American's "Job Description and Essential Functions" for Mr. Miller's position, qualifications for that position include, among other things: a) "Capability of decision-making under stress"; b) "The ability to adapt to diversified flight schedules, situations, or scenarios"; c) "[A]daptable personality"; d) Ability to "work varying hours of the day or night" and be "on duty for as long as twelve to fourteen hours... span[ning] many time zones and extreme weather differences in the course of a trip." *See* Exhibit 55 (Request for WME Review) at AA 808-811.

84. None of these qualifications were addressed by the WME Report. *See* Exhibit 56 (WME Report).

85. According to Ms. Teklitz, the individual responsible for deciding Mr. Miller's appeal, Western Medical Evaluators is supposed to consider the specific job requirements for acting as a commercial pilot at American, because "you can't determine whether or not someone's disabled from their job without actual understanding what their job is." *See* Exhibit E (Teklitz Dep.) at 90:20-91:21; *see also* Paragraph 99, *infra*.

86.  WME's report focused extensively on Mr. Miller's failure to reapply for FAA certification in concluding that Mr. Miller is not disabled. *See* Exhibit 56 (WME Report) at 817.

87.  Ms. Teklitz, the individual responsible for deciding Mr. Miller's appeal, testified that one of the factors she would consider in determining whether further review beyond the WME report was appropriate is whether she felt "that they [WME] have an adequate understanding of the plan and how it works." *See* Exhibit E (Teklitz Dep.) at 148:7-149:19; *see also* Paragraph 99, *infra*.

88.  Ms. Teklitz testified that while she could not recall a specific circumstance in which WME did not have an adequate understanding of the American Plan, the American Plan is "different than a typical loss of license insurance [Plan] where if you don't have your FAA certificate you get a benefit" because "[i]n this case you have to be disabled from the occupation of pilot, and the FAA certification is not specifically relevant." *See* Exhibit E (Teklitz Dep.) at 149:7-19.

89.  WME's report relied on numerous documents that had previously been reviewed by American and determined to support an award of disability benefits in concluding that Mr. Miller was not disabled. *See* Exhibit 56 (WME Report) at AA 813-17; Exhibit 2 (Case Management Notes) at AA 757-59; *see also* Exhibit 6 (6/10/03 Letter from Dr. Gonzalez to AA); Exhibit 7 (Gonzalez Initial Psychiatric Assessment); Exhibit 8 (Gonzalez 2002 Progress Notes); Exhibit 9 (Gonzelez 2003 Progress Notes).

90.  American never informed Mr. Miller at any time that the medical documentation that had previously been reviewed by American and determined to support an award of disability benefits might be relied on to justify a denial of benefits. *See generally* Exhibit 1 (October 2006 Termination Letter); *see also* Paragraphs 51-59, *supra*.

91.  Ms. Teklitz, the individual responsible for deciding Mr. Miller's appeal, testified that if she or her colleagues believe that there are any limitations or deficiencies in the WME report, including a failure to address a diagnosis, they will take steps to obtain further information, which may include following up with additional questions for WME, asking WME to address

omitted information, and/or requesting an outside review by another specialist.  *See* Exhibit E (Teklitz Dep.) at 92:5-14, 288:6-290:17; *see also* Paragraph 99, *infra*.

92.    Following receipt of the WME report, no steps were taken by American to obtain further outside review by another specialist or to obtain corrections or clarifications to the WME report.  *See* Exhibit 56 (WME Report); Exhibit 57 (Appeal Determination Packet) (quoting original WME report verbatim, and not referencing any clarifications or corrections to the report or other outside reviews); Exhibit 58 (May 2007 Termination Letter) (same).

93.    Mr. Miller's appeal not denied until May 22, 2007, nearly 6 months after the filing of Mr. Miller's appeal.  *See* Exhibit 58 (May 2007 Termination Letter); *see also* Paragraph 60, *supra*.

94.    The May 2007 termination letter quoted the entirety of the WME report verbatim, summarizing in conclusion that "Western Medical Evaluators determined that the evidence presented does not document continuing disability beyond October 23, 2006, and does not document continued appropriate medical care and treatment for a condition giving rise to a disability.  In view of this determination, AAMOHS' discontinuance of the Pilot's LTD benefits under the Plan was...proper....".  *See* Exhibit 58 (May 2007 Termination Letter) at AA 1030-1034.

95.    No other analysis of whether termination of Mr. Miller's disability benefits was appropriate was provided.  *See* Exhibit 58 (May 2007 Termination Letter).

96.    The May 2007 termination letter did not:

    a)    dispute that Mr. Miller had a diagnosis of Anxiety Disorder NOS, or even substantively address that diagnosis, *see* Exhibit 58 (May 2007 Termination Letter);

    b)    address Mr. Miller's psychiatric treatment or discuss whether it was appropriate medical treatment for Anxiety Disorder NOS, *see* Exhibit 58 (May 2007 Termination Letter);

c)     mention the job requirements for commercial airline pilots, *see* Exhibit 58 (May 2007 Termination Letter).

97.    The May 2007 termination letter repeatedly indicated that Mr. Miller's appeal was decided by the PBAC, stating for example that "the PBAC conducted an extensive review and analysis of [Mr. Miller's] case" and that the letter provided a description of the "means by which the PBAC arrived at its decision."  *See* Exhibit 58 (May 2007 Termination Letter) at AA 1028.

98.    In fact, the PBAC did not conduct any review of Mr. Miller's case, nor did it arrive at any decision with respect to Mr. Miller's claim.  *See* Exhibit E (Teklitz Dep.) at 97:18-102:17, 112:21-113:6, 113:13:22, 182:10-19.

99.    Mr. Miller's appeal was instead decided by an individual named Charlotte Teklitz, who is not referenced in the May 2007 termination letter.  *See* Exhibit 57 (Appeal Determination Packet) at AA 715; Exhibit E (Teklitz Dep.) at 137:16-138:14; *see also* Exhibit 58 (May 2007 Termination Letter).

100.   Prior to the inception of this litigation, Mr. Miller had no notice that Ms. Teklitz participated in, much less decided, his appeal.  *See generally* (May 2007 Termination Letter) (erroneously claiming that the PBAC decided Mr. Miller's appeal); Exhibit E (Teklitz Dep.) at 182:23-183:11.

101.   On October 19, 2007, Mr. Miller requested that American provide all "relevant" documents, as defined under ERISA's claims regulations.  *See* Exhibit 21 (Miller October 19, 2007 Request for Documents).

102.   On November 20, 2007, American represented that all "relevant" documents relating to the PBAC appeal had been provided.  *See* Exhibit 23 (American November 20, 2007 Response to Request for Documents).

103.   American, had not, in fact provided all "relevant" documents, and specifically had not provided the document later produced as AA 709-AA 715 (Exhibit 57).  *See* Exhibit I (Eyer Declaration), ¶¶ 4-5; *see also* Exhibit 57 (Appeal Determination Packet).

104.   AA 709-AA 715 (Exhibit 57) is the only document that Ms. Teklitz specifically identified as having been reviewed by her in connection with

Mr. Miller's appeal. *See* Exhibit E (Teklitz Dep.) at 107:5-108:6; 111:7-11; 135:6-140:16; *see also* Exhibit 57 (Appeal Determination Packet).

105. AA 709-AA 715 (Exhibit 57) makes clear that Ms. Teklitz – not the PBAC – was the individual responsible for deciding Mr. Miller's appeal. *See* Exhibit 57 (Appeal Determination Packet) at AA 715.

## II.   THE PLAN

106. At all times relevant to this action, Mr. Miller has been a "participant" in the American Airlines, Inc. Pilot Retirement Benefit Program Fixed Income Plan (A Plan) (hereinafter "the Plan"). *See* Exhibit 51 (Amended Complaint), ¶ 5; Exhibit 52 (Answer to Amended Complaint), ¶ 5; *see also* 29 U.S.C. § 1002(7).

107. The Plan is an ERISA Plan that provides both disability and pension benefits to pilots. *See* Exhibit 24 (2005 American Airlines, Inc. Pilot Retirement Benefit Program SPD (hereinafter "SPD")) at Miller 74-79, 130.

108. American Airlines, Inc. is the Plan Administrator. *See* Exhibit 24 (SPD) at Miller 137.

109. American has appointed a Pension Benefits Administration Committee (PBAC), which is comprised entirely of American personnel. *See* Exhibit 24 (SPD) at Miller 137; Exhibit E (Teklitz Dep.) at 53:6-22.

110. Initial determinations with respect to disability claims are made by American. *See* Exhibit 24 (SPD) at Miller 132-33.

111. The PBAC or its delegatee is responsible for deciding disability appeals. *See* Exhibit 24 (SPD) at Miller 134-35, 137; Exhibit E (Teklitz Dep.) at 52:10-53:3; Exhibit J (Excerpts of Plan Document) at Miller 33[3]-AA 145, AA 152-153.

---

3. The page of the Plan set forth at Miller 33 was initially accidentally omitted from the Defendants' production, and therefore does not appear sequentially in the bates numbers with the other Plan pages.

112. The Plan is wholly funded by contributions from American. *See* Exhibit 24 (SPD) at Miller 94.

113. REDACTED - FULL VERSION FILED UNDER SEAL

114. The value of the Plan's assets as reported on American's 2006 Form 5500 was $1,910,216,151. *See* Exhibit K (2006 Plan Form 5500), at Miller 0492.

115. REDACTED - FULL VERSION FILED UNDER SEAL

116. REDACTED - FULL VERSION FILED UNDER SEAL

117. Defendants' 10-K Report, submitted to the Securities and Exchange Commission on February 24, 2006, identifies Defendants' "substantial, and increasing pension funding obligations" as a "Risk Factor" that could "adversely effect our business and liquidity." *See* Exhibit L (Excerpts from American Airlines 2005 10-K Report (*hereinafter* "2005 10-K Report")) at Miller 537, Miller 550-51.

118. Defendants' 10-K Report, submitted to the Securities and Exchange Commission on February 24, 2006, states that Defendants' defined benefits plans were underfunded by $3.2 billion based on the PBO. *See* Exhibit L (2005 10-K Report) at Miller 567, 614.

119. The Plan that Mr. Miller's disability benefits were paid out of is one of Defendants' defined benefits pension plans. *See* Exhibit 24 (SPD) at Miller 138.

120. American was involved in lobbying for pension relief legislation during 2006 and 2007. *See* Exhibit D (Defendants' Supp. Interrogatory Responses), #16.

121. Ms. Teklitz was aware of the underfunding of American's pension plans, and of American's efforts to lobby for relief from its pension funding obligations. *See* Exhibit E (Teklitz Dep.) at 267:9-269:11, 276:11-277:15.

122. Section 13.3(d) of the Plan is titled "Authority to Construe the Plan" and states that "The Pension Benefits Administration Committee shall have discretionary authority to construe the terms of the Plan...and...to determine eligibility for and entitlement to Plan benefits." *See* Exhibit J (Excerpts of Plan Document) at AA 152-153.

123. Ms. Teklitz testified that she has been delegated authority by the PBAC to "sign" or "decide" appeals. *See* Exhibit E (Teklitz Dep.) at 93:16-94:10.

124. Ms. Teklitz was unable to identify any other area in which she had been delegated authority by the PBAC. *See* Exhibit E (Teklitz Dep.) at 92:15-95:18.

125. When specifically asked whether she had been delegated authority to interpret the Plan, Ms. Teklitz stated, "I'm not even sure how to answer that question. I guess the plan is what the plan is. It's not very long and it's pretty specific." *See* Exhibit E (Teklitz Dep.) at 93:6-14.

126. There is no evidence that Ms. Teklitz – or any other entity – undertook to interpret any Plan terms in the course of deciding Mr. Miller's appeal. *See* Exhibit 58 (May 2007 Termination Letter); Exhibit E (Teklitz Dep.) at 31:9-42:10, 93:6-14; Exhibit 57 (Appeal Determination Packet); *see also* Paragraphs 124-25, *supra* and Paragraph 127, *infra*.

127. When asked her opinion as to whether "a pilot is receiving qualified medical care is the same question of whether or not they are wantonly disregarding appropriate medical care," Ms. Teklitz testified "I think that's probably a better question for a medical reviewer than for me." *See* Exhibit E (Teklitz Dep.) at 35:15-24; *see also* Exhibit E (Teklitz Dep.) at 33:20-35:5, 163:7-18 (expressing similar sentiments).

128. Under the terms of the Plan, "disability" is defined as "an illness or injury verified through a qualified medical authority that prevents a pilot from continuing to work as a pilot for the Company." *See* Exhibit 24 (SPD) at Miller 106.

129. If a Pilot is disabled from performing their work as an American pilot, they qualify for benefits even if they could obtain employment in a different occupation. *See* Exhibit 24 (SPD) at Miller 106.

130. Failure of a pilot to seek FAA medical recertification is not a basis for termination of disability benefits under the Plan. *See* Exhibit 24 (SPD) at Miller 106-108; Exhibit E (Teklitz Dep.) at 144:3-145:2; Exhibit D, #5.

131. Charlotte Teklitz, the decision-maker who denied Mr. Miller's appeal testified "...the Plan has no requirement....for the pilot to continue to try to get their FAA designation." *See* Exhibit E (Teklitz Dep.) at 144:14-16.

132. Ms. Teklitz also testified that "In this case you have to be disabled from the occupation of pilot, and the FAA certification is not specifically relevant." *See* Exhibit E (Teklitz Dep.) at 149:16-19.

133. The SPD section titled "When Disability Benefits End" sets out the exclusive grounds for the termination of a Pilot's disability benefits. *See* Exhibit 24 (SPD) at Miller 107; Exhibit A (Bettes Dep.) at 286:7-287:7; Exhibit E (Teklitz Dep.) at 41:16-42:10.

134. The only medical care related standard that appears in the SPD section titled "When Disability Benefits End" is as follows: "Disability benefits end when the pilot...[w]antonly disregards appropriate medical care." *See* Exhibit 24 (SPD) at Miller 107.

135. A separate section of the SPD indicates that "a pilot must continue to receive qualified medical care consistent with the nature of the illness or injury that resulted in the Disability." *See* Exhibit 24 (SPD) at Miller 106.

136. The "qualified medical care" standard was not understood by American staff as providing a basis for termination of benefits independently of the

"wanton disregard" standard. *See* Exhibit A (Bettes Dep.) at 101:14-102:23, 286:7-287:7; Exhibit E (Teklitz Dep.) at 31:9-24, 103:14-22.

137. Defendants' responses to Interrogatories indicate that Plaintiff's benefits were not "terminated in whole or in part because Plaintiff wantonly disregarded appropriate medical care." *See* Exhibit D (Defendants' Supp. Interrogatory Responses), #4.

138. Plaintiff did not wantonly disregard appropriate medical care. *See* Exhibit D (Defendants' Supp. Interrogatory Responses), #4; Exhibit A (Bettes Dep.) at 108:3-8; Exhibit E (Teklitz Dep.) at 158:2-14, 165:17-166:6; *see generally* Exhibit 59 (Miller Appeal Packet) at AA 738-739.

## III.   FAA MEDICAL CERTIFICATION

139. A first or second class FAA medical certificate is required in order to serve as a commercial airline pilot. *See* 14 C.F.R. § 61.23.

140. Mr. Miller's FAA medical certification was revoked in 1998 or 1999. *See* Exhibit 18 (Misc Medical Records) at AA 787; Exhibit 61 (Admissions), ¶ 3.

141. Dr. Wolbrink (one of American's Area Medical Directors) testified that psychosis is a "disqualifying" condition for FAA medical certification. *See* Exhibit C (Wolbrink Dep.) at 72:16-21; *see also* Exhibit C (Wolbrink Dep.) at 14: 18-21.

142. Dr. Wolbrink also testified that the FAA can authorize an exception to disqualifying conditions. *See* Exhibit C (Wolbrink Dep.) at 82:14-25.

143. Dr. Wolbrink testified that he is unaware of any circumstances in which the FAA has granted an exemption to a pilot who had a psychosis for the purposes of obtaining a first or second class medical certificate. *See* Exhibit C (Wolbrink Dep.) at 85:19-86:10.

144. American Airlines' Medical and Occupational Health Services Department ("AAMOHS") sometimes considers the failure of a pilot to seek FAA recertification as part of their determination that a pilot's disability benefits

should be discontinued. *See* Exhibit A (Bettes Dep.) at 73:17-22, 89:5-11, 92:11-20.

145. If a determination is made by AAMOHS that it might be helpful or relevant for a pilot to seek FAA recertification that information is communicated to the pilot by AAMOHS's Nurse Case Manager. *See* Exhibit A (Bettes Dep.) at 98:14-23.

## IV.    UNTIMELY PROCESSING OF MR. MILLER'S APPEAL

146. Under ERISA claims regulations, a response to Mr. Miller's appeal was due within 45 days of receipt of the appeal. *See* 29 C.F.R. § 2560.503-1(i)(1) & (3).

147. The Plan's claims appeals procedures state that "[i]f....the PBAC (or its delegate) denies the claim that the pilot has a Disability, a notice will be provided...not later than 45 days from the day the request for a review was received by the Plan Administrator." *See* Exhibit 24 (SPD) at Miller 0134.

148. Under ERISA claims regulations, Plans are allowed to extend the initial 45 day time period, if they specifically inform a claimant that special circumstances necessitate an extension of time, and specify what circumstances require the extension. *See* 29 C.F.R. § 2560.503-1(i)(1) & (3).

149. There is no evidence that the Plan ever informed Mr. Miller of any special circumstances necessitating an extension of time in connection with his appeal. *See* Exhibit E (Teklitz Dep.) at 115:1-3.

150. Even if Defendants had properly obtained an extension, their adjudication of Mr. Miller's appeal would have been due, at the latest, by late February or early March. *See* Paragraphs 60, 146 and 147, *supra*; *see also* Exhibit D (Defendants' Supp. Interrogatory Responses), #11.

151. Defendants concede that Mr. Miller's appeal was due, at the latest, by March 4, 2007. *See* Exhibit D (Defendants' Supp. Interrogatory Responses), #11.

## V.   MISCELLANEOUS PROCEDURAL MATTERS

152. This case was filed on February 13, 2008, raising a single claim for benefits under ERISA, and seeking attorneys' fees. Exhibit 53 (Original Complaint) at 12-13.

153. At the time of the parties' initial Joint Case Management Plan, both parties agreed that further discovery would be warranted if *de novo* review was granted, but that it would be appropriate to defer such discovery pending a ruling on the propriety of *de novo* review. *See* Exhibit M (Joint Case Management Plan) at 10 n. 2 & n.4.

Respectfully submitted,

/s/ Katie R. Eyer
Katie R. Eyer - ID. 200756
Michael J. Salmanson - ID. 46707
SALMANSON GOLDSHAW, P.C.
Two Penn Center
1500 J.F.K. Blvd., Suite 1230
Philadelphia, PA  19102
215-640-0593

Date:  December 8, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT T. MILLER | : | |
| | : | Civ. Action No. |
| v. | : | |
| | : | 08 - cv - 0277 |
| AMERICAN AIRLINES, INC., | : | |
| and | : | Judge Caputo |
| AMERICAN AIRLINES, INC. PILOT | : | Magistrate Judge Blewitt |
| RETIREMENT BENEFIT PROGRAM | : | |
| FIXED INCOME PLAN (A PLAN) | : | |
| and | : | |
| AMERICAN AIRLINES, INC. PENSION | : | |
| BENEFITS ADMINISTRATION | : | **CERTIFICATE OF SERVICE** |
| COMMITTEE | : | |
| _____ | : | |

I hereby certify that on December 8, 2008, I caused a true and correct copy of the foregoing Plaintiff's Statement of Material Facts and Exhibits to be filed via the Official Court Electronic Document Filing System, and that said Statement and Exhibits are therefore available for viewing and downloading from the ECF system.  By virtue of this filing, service of the Statement and Exhibits upon the following counsel, being Electronic Case Filing Users, is complete upon counsels' receipt of the Court's e-mail notification of the Notice of Electronic Filing:

> Donald L. Havermann
> Jonathan S. Krause
> Michael Puma
> Justin O. Reliford

Copies of matter redacted in the electronic version of the foregoing

Statement and Exhibits were also filed with the Court by Federal Express on this

date, and served on the forgoing counsel by Federal Express at the below

addresses:

Michael J. Puma
Justin O Reliford
Jonathan S. Krause
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103

Donald L. Havermann
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

By:___/s/ Katie R. Eyer_____
        Katie R. Eyer - ID. 200756