**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT T. MILLER,** | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No. 08-CV-277** |
| | : | |
| **v.** | : | **(Judge Caputo)** |
| | : | |
| **AMERICAN AIRLINES, INC.,** | : | **(Magistrate Judge Carlson)** |
| **AMERICAN AIRLINES, INC. PILOT** | : | |
| **RETIREMENT BENEFIT PROGRAM** | : | |
| **FIXED INCOME PLAN (A PLAN), and** | : | |
| **AMERICAN AIRLINES, INC. PENSION:** | | |
| **BENEFITS ADMINISTRATION** | : | |
| **COMMITTEE,** | : | |
| | : | |
| **Defendants** | : | |

**REPORT AND RECOMMENDATION**

## I.     INTRODUCTION

Plaintiff Robert T. Miller brought this action under section 502(a)(1)(B) of

the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1132(a)(1)(B), in an effort to have this Court set aside Defendants' decision to

terminate his long-term disability benefits under an ERISA-governed employee

benefits plan.  Now pending before the Court are the parties' cross motions for

summary judgment on Plaintiff's claims.  The motions are fully briefed and ripe

for disposition.

The undisputed evidence set forth in these competing motions reveals that

the plaintiff is an airline pilot who was found to be disabled following a psychotic breakdown while in the cockpit of an airliner and who continues to be diagnosed with anxiety disorder. In 2006, Plaintiff's disability benefits were discontinued by the defendants without any prior notice. The decision to discontinue these benefits was based upon a medical record that was unchanged and which had previously been found by Defendants to support a disability finding. The decision to terminate benefits was communicated to the plaintiff in an inaccurate and misleading letter which imposed requirements upon the plaintiff that are not part of the benefit plan, but which otherwise refused to explain how the plaintiff could effectively rebut this unilateral determination that he was no longer disabled.

When the plaintiff appealed this decision, Defendants sustained their unilateral choice to terminate benefits on the basis of consulting expert reports which ignored one of Plaintiff's principal diagnoses – anxiety disorder – and failed to take into account the unique, and uniquely stressful, job duties of an airline pilot, duties which make the failure to address the plaintiff's anxiety disorder a glaring omission.

Taken together, we believe that these procedural and substantive oversights render the defendants' unilateral decision to terminate benefits arbitrary and capricious. Accordingly, for the reasons set forth below, it is recommended that

Plaintiff's motion be granted, that Defendant's motion be denied, that judgment be entered in Plaintiff's favor, and that the Court order the retroactive reinstatement of Plaintiff's long-term disability benefits, with interest.[1]

## II.   **BACKGROUND**[2]

Between February 1989 and August 1998, Plaintiff Robert T. Miller was employed as a commercial airline pilot with Defendant American Airlines, Inc.  In August 1998, while co-piloting an airplane, Plaintiff's mental state became unstable and the plane he was co-piloting had to be taxied back to the terminal; upon arrival, Plaintiff had to be physically removed from the cockpit. Immediately thereafter, Plaintiff was hospitalized and diagnosed with a severe

---

[1]  The Court is constrained to note, at the outset, that it recommends no conclusion as to whether Plaintiff does, in fact, continue to qualify for long-term disability benefits under Defendants' plan, or whether Defendants may have a reasonable basis to pursue the termination of Plaintiff's benefits under the plan.  Instead, it is recommended only that the Court find that the procedures that were followed with respect to Defendants' termination of Plaintiff's benefits, as well as the substantive bases given therefor, were sufficiently lacking so as to be arbitrary and capricious, and therefore that the termination of benefits should be vacated.  In short, it is recommended that the parties be returned to the *status quo ante* the benefits termination and the subsequent appeal thereof.

[2]  Both Plaintiff and Defendants have submitted statements of undisputed material facts, and have also filed Rule 56.1 counterstatements in response.  To note that there are substantial disputes regarding the asserted undisputed facts would be an understatement.  The Court has reviewed each party's submissions with care, and has further reviewed the evidence submitted in support of, and opposition to, the asserted facts.  The background information set forth in this report and recommendation is taken from the Court's independent review of these statements and counterstatements, and an objective assessment of the evidence offered in support of or opposition to the asserted facts.  The Court has not weighed the evidence and has not relied upon asserted undisputed facts where the record reveals a genuine dispute.

psychosis. Following his subsequent release from the hospital, Plaintiff treated with a psychiatrist who diagnosed him with a number of psychiatric conditions, including anxiety disorder and brief reactive psychosis. During the period immediately following his diagnosis, Plaintiff was prescribed psychoactive medication to address his psychosis and began receiving treatment. In consideration of Mr. Miller's diagnosis and psychiatric condition, American determined that Plaintiff qualified to receive long-term disability benefits under the American Airlines, Inc. Pilot Retirement Benefit Program Fixed Income Plan (A Plan) (the "Plan"), effective in November 1999.

The Plan is a defined benefit plan that provides retirement benefits to participants and their beneficiaries; the Plan is subject to ERISA. One benefit conferred under the plan is the Disability Retirement Benefit, which provides long-term disability benefits to participants who meet the eligibility requirements of the Plan. The long-term disability benefit under the Plan provides for so-called "own occupation" disability benefits, meaning that a pilot deemed disabled from employment as a pilot qualifies to receive long-term disability benefits under the Plan, even if that pilot had the capacity to be employed in a different occupation. (Pl. Statement of Undisputed Facts, ¶ 129.) The Plan grants discretion to the American Airlines Inc., Inc. Pension Benefits Administration Committee (the

"Committee") to interpret the Plan, to make eligibility determinations, and to administer procedures relating to claims appeals. (Def. Statement of Undisputed Facts ¶ 1, Ex. A.)

Section 2.1(af) of the Plan specifically defines "Disability" as "an illness or injury, verified through qualified medical authority (as provided in Section 5.4) which prevents a Member from continuing to act as an Active Pilot Employee in the Service of the Employer." (Def. Statement of Undisputed Facts ¶ 3, Ex. A.) American has described the essential functions of an active pilot to include, among other things: (1) "[c]apability of decision-making under stress"; (2) "ability to adapt to diversified flight schedules, situations, or scenarios"; (3) "adaptable personality"; (4) the ability to "work varying hours of the day or night" and "be on duty for as long as twelve to fourteen hours . . . span[ning] many time zones and extreme weather differences in the course of a trip." (Pl. Statement of Undisputed Facts, ¶ 83, Ex. 55 at AA 808-811.)

Section 5.4 of the Plan, as amended, defines the eligibility requirements for receiving long-term disability benefits under the Plan, and provides specifically as follows:

> The Existence of a Disability of a Member and his eligibility for a Disability Retirement Benefit shall be determined in accordance with the following rules:

(a) A Member's Disability must have occurred prior to February 1, 2004;

(b) A Member's Disability will be considered to have existed (and to continue to exist) only if he has received and continues to receive qualified medical care consistent with the nature of the illness or injury which gives rise to such Disability;

(c) A Member's disability will be considered to cease to exists if (I) his health is restored so as not to prevent him from acting as an Active Pilot Employee in the service of the Company, (ii) verification of such Disability can no longer be established or (iii) appropriate medical care is wantonly disregarded by such Member;

(d) Verification of a Member's Disability shall be established by the corporate medical director of the Company (the "Corporate Medical Director") through claims procedures agreed to between the Company and the [Allied Pilots] Association. Any Disability may be subject to re-verification, when appropriate, every ninety (90) days;

(e) Any dispute as to the clinical validity of a Member's claim of the existence of a Disability or the continuation of the illness or injury which gave rise to such Disability shall be referred to a clinical authority selected by agreement between the Company and the Association, and the findings of such authority regarding the nature and extent of such illness or injury shall be final and binding upon the Administrator, the [Allied Pilots] Association and the Member and his Beneficiaries. The cost of referral of a dispute to a clinical authority pursuant to this paragraph, including the cost of all examinations or proceedings in connection therewith, shall be shared equally by the Company and the [Allied Pilots] Association . . . .

(Def. Statement of Undisputed Facts, Ex. A, at AA 121-23.)

Section 11.1 of the Plan, as amended, provides that "[American] shall be the

Administrator and the 'named fiduciary' of the Plan . . . except to the extent such responsibility and authority has specifically been assigned herein to . . . the Pension Benefits Administration Committee." (Id., Ex. A, at AA 158.)  Section 11.3(c) of the Plan, in turn, confers discretion to the Committee, and provides as follows:

> [T]he Pension Benefits Administration Committee shall have the authority and responsibility, and shall be a fiduciary of the Plan to the extent of such fiduciary authority and responsibility, to: . . . (iii) decide questions concerning the application or interpretation of the Plan and the Prior Plan, including but not limited to determinations of eligibility for benefits; . . . (v) administer the claims appeal procedures of the Plan . . . .

(Id., Ex. A, at AA 144A-45.)  In addition, Section 13.1(a)(ii) of the Plan, as amended, provides: "[T]he Pension Benefits Administration Committee . . . may designate a person or persons to carry out any duties for which they are otherwise responsible under the Plan." (Id., Ex. A, at AA 151.)  Pursuant to this authority, the Committee delegated its authority to decide appeals regarding disability benefits under the Plan to Charlotte Teklitz.  (Def. Statement of Undisputed Facts at ¶ 8.)

Following his psychotic episode, subsequent hospitalization, and diagnosis with, inter alia, brief reactive psychosis and anxiety disorder, Plaintiff was deemed

qualified to receive, and began receiving, long-term disability benefits under the Plan in November 1999.  American continued to deem Plaintiff eligible, and to pay him benefits, until February 2003, when American suspended his payments following American's institution of a disability management program, and after American made several unsuccessful attempts to contact Plaintiff to receive medical information deemed necessary to continue his disability payments.  (Pl. Statement of Undisputed Facts, ¶ 10; Def. Opp. to Pl. Statement of Undisputed Facts, ¶ 10.)

Following this suspension of his payments, Plaintiff contacted American and requested that his benefits be reinstated.  (Pl. Statement of Undisputed Facts, ¶ 11.)  At some point following this contact, Jeanne Spoon, Plaintiff's nurse manager at American, took notes to indicate that American planned to "[o]btain med, review, notify pensions if med. adeq. to support continued medical disability."  (Pl. Statement of Undisputed Facts, ¶ 13, Ex. 2 (Case Management Notes) at AA 757 and Ex. B (Spoon Dep.) at 72:5-18; Def. Opp. to Pl. Statement of Undisputed Facts, ¶ 13.)  Ms. Spoon's notes further reveal the following as part of Plaintiff's case management plan: "Review medical when receive, - [Medical Review Board] determine if documentation substantiates medical disability." (Pl. Statement of Undisputed Facts, ¶ 15, Ex. 2 (Case Management Notes) at AA 757.)

Following Plaintiff's communications with American, but prior to the reinstatement of his benefits, Plaintiff's treating physician, Dr. Abel Gonzalez, submitted a number of medical records to American on Mr. Miller's behalf. (Pl. Statement of Undisputed Facts, ¶ 17, Ex. 2 (Case Management Notes) at 757-758; Ex. 6 (Letter from Dr. Gonzalez to American dated June 10, 2003); Ex. 7 (initial psychiatric assessment); Ex. 8 (2002 progress notes); and Ex. 9 (Dr. Gonzalez 2003 progress notes).) Following the submission of these documents, American reinstated Plaintiff's disability benefit payments on or around July 15, 2003, including payments covering the period during which Plaintiff's payments had been suspended. (Pl. Statement of Undisputed Facts, ¶ 20; Def. Opp. to Pl. Statement of Undisputed Facts, ¶ 20.) One of American's area medical directors, Dr. Beaty, took steps to note in Plaintiff's file that he "Medically qualifies for [the] disability pension program." (Pl. Statement of Undisputed Facts, ¶ 21; Def. Opp. to Pl. Statement of Undisputed Facts, ¶ 21.)[3] Following the submission of his

---

[3] Plaintiff asserts that Dr. Beaty "verified" that Plaintiff was medically qualified to receive disability benefits, whereas Defendants claim this is an inaccurate description of Dr. Beaty's role. (Pl. Statement of Undisputed Facts, ¶ 21.) Instead, Defendants contend that Dr. Beaty did nothing more than to sign a document and "check[] a box on a form" to indicate that Plaintiff was medically qualified. Defendants also argue that the reinstatement of disability benefit payments for someone, like Plaintiff, who was still active in the disability benefit program – albeit, someone whose payments had been abruptly cut off – is a mere "administrative action" that "does not require the substantive review of medical records or the participation of American's Corporate Medical Director." (Def. Statement of Material Facts, ¶ 21.) It is clear that Defendants are attempting to minimize the evidentiary significance of Dr. Beaty's

medical records, and Dr. Beaty's administrative action, Plaintiff's benefits

payments were reinstated, including payments to cover the period during which

his payments had been suspended.  (Id.)

Over the following two years, Dr. Gonzalez submitted various medical

records to American relating to Plaintiff's psychiatric condition.[4]  These

documents generally reveal that Plaintiff's medical and psychiatric condition

remained stable and constant during this time, with notes in the file from a 2005

letter from Dr. Gonzalez that indicated Plaintiff's "condition [was] stable and he

[was] completely asymptomatic without any ongoing or active treatment" during

this period.  (Def. Statement of Material Facts, ¶ 22, Ex. Q.)  Dr. Gonzalez also

advised American that he continued to see Mr. Miller regularly.  (Pl. Statement of

Undisputed Facts, ¶ 27, Ex. 2 (Case Management Notes) at AA 759; Ex. 12 (Letter

dated August 26, 2005, from Dr. Gonzalez to American.)  During this period of

administrative function in reinstating Plaintiff's benefit payments.  The Court need not attempt to
resolve this particular factual dispute because the salient, undisputed fact is that Plaintiff's
benefits and payments were reinstated following the submission of Dr. Gonzalez's medical
documentation and following Dr. Beaty's authorization directing that benefits payments be
resumed.

[4]  It is unclear from the evidence whether any of American's doctors or other medical
professionals reviewed these materials in substantive detail prior to 2006, notwithstanding
Plaintiff's assertion that the documents were reviewed by Dr. Alex Wolbrink (one of American's
Area Medical Directors) or Dr. Thomas Bettes (American's Corporate Medical Director).  The
deposition testimony that Plaintiff has identified does not clearly support his assertion that one of
these doctors reviewed the records.  (See Pl. Statement of Undisputed Facts, ¶ 23 & exhibits
identified therein.)

time, during which American received periodic updates from Dr. Gonzalez

regarding Plaintiff's psychiatric condition, treatment, and general prognosis,

American continued to pay Plaintiff disability benefit payments.[5]

Plaintiff continued to be paid benefits under the plan until October 2006,

when Dr. Bettes found him to be ineligible after concluding that (1) he could no

longer verify that Plaintiff was disabled and (2) Plaintiff was no longer receiving

medical care consistent with the illness that precipitated his disability. As a result

---

[5] Defendants suggest that, because none of their medical professionals could testify that they recalled making a determination regarding Plaintiff's eligibility for benefits between 1999 and 2006, there is insufficient evidence to support Plaintiff's assertion that American determined on at least two occasions that Mr. Miller continued to qualify. The Court does not find that this fact is really disputed; to the contrary, American's witnesses testified only that they essentially have no meaningful memory of Plaintiff's case. The notes taken by Ms. Spoon, which are part of Plaintiff's case management file, reveal that on December 21, 2004, Ms. Spoon reviewed certain of Plaintiff's medical records with American's Corporate Medical Director, Dr. Thomas Bettes, who apparently determined that American would continue to approve Mr. Miller for benefits and that it did not appear that Mr. Miller would return to work as a result of his diagnosis and condition. (Pl. Statement of Undisputed Facts, Ex. 2 (Case Management Notes) at AA 759.) More than eight months later, on August 29, 2005, Ms. Spoon made notes regarding information received from Dr. Gonzalez. These notes reflect that Plaintiff remained asymptomatic without taking psychotropic medications, while being instructed to obtain an adequate amount of sleep on a regular basis to avoid physical and psychological manifestations of stress – care asserted to be appropriate for any healthy man of Mr. Miller's age. According to Ms. Spoon's notes that summarizing the update from Dr. Gonzalez, the plan for Mr. Miller's benefits assessments included discussing the pursuit of Mr. Miller's potential return to work and the FAA regulations bearing upon that process. (Id.) Nevertheless, Defendants never raised this issue with Plaintiff and American made no change to Plaintiff's benefits eligibility determination during this time. Indeed, Dr. Bettes testified during his deposition that if a benefits recipient had been determined no longer eligible to receive disability benefits, that determination typically would be reflected in the case management notes. The notes from Mr. Miller's file reveal that American made no change to Mr. Miller's eligibility – and continued to make disability payments to him – until October 25, 2006, when it issued a discontinuation of benefits letter. (Id., at AA 760.)

of these conclusions, American terminated Plaintiff's disability benefits, without prior warning or notice, in October 2006. The decision to terminate Mr. Miller's disability benefits was made by Dr. Thomas Bettes, the chief officer of American Airlines' Medical and Occupational Health Services Department ("AAMOHS"). The letter to Mr. Miller notifying him that his benefits were being terminated advised him that the adverse decision had been made because his medical records did not verify the continued presence of a disability and because Plaintiff failed to receive qualified medical care consistent with the nature of the illness or injury giving rise to his disability. (Pl. Statement of Undisputed Facts, Ex. 1, Letter from Dr. Thomas Bettes to Captain Robert Miller, dated October 23, 2006.)

The notification letter also asserted that in order for Plaintiff "to receive further favorable consideration," he would "need to demonstrate that [he was] actively pursuing obtaining [his] FAA medical certification." (Id.) It does not appear that any American representative had ever requested that Plaintiff seek to reapply for certification as an airline pilot, as nothing in Plaintiff's case management notes reveal that such a request was ever made, and none of American's witnesses who were deposed in this case could remember making such a request. (Pl. Statement of Undisputed Facts, ¶¶ 31-34; Def. Opposition to Plaintiff's Statement of Facts, ¶¶ 31-34.) Although Dr. Bettes testified during his

deposition that Plaintiff's failure to seek recertification with the FAA was not actually a factor in the decision to terminate his benefits, (Def. Opposition to Pl. Statement of Undisputed Facts, ¶ 40), and that pursuit of FAA certification might have been relevant to the extent it could have generated additional medical records for consideration, (id. at ¶ 42), the termination letter itself provided that "in order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing obtaining your FAA medical certification."  Nothing in the Plan makes eligibility for long-term disability benefits contingent upon pursuing recertification with the FAA.  (Pl. Statement of Undisputed Facts, ¶¶ 130-32.) Furthermore, despite notes in Plaintiff's file suggesting that American, or certain of its employees, believed Plaintiff might be eligible for recertification after a period of time, nothing in the record suggests that American ever raised this issue with Plaintiff.

Between January 2003 and October 2006, when American terminated Plaintiff's benefits, Plaintiff's psychiatric condition and treatment remained relatively unchanged, with Dr. Gonzalez consistently reporting that he was asymptomatic and that his mental condition remained stable.  (Pl. Statement of Undisputed Facts, ¶ 36; Def. Opposition to Pl. Statement of Undisputed Facts, ¶ 36.)  Indeed, Defendants acknowledge that they are unable to determine whether

Plaintiff experienced any change in his psychiatric condition or treatment between January 2003 and May 2007. (Pl. Statement of Undisputed Facts, ¶ 36(a).)[6] Similarly, Charlotte Teklitz, the Plan Administrator's delegate charged with rendering a decision on Mr. Miller's appeal of his benefits termination, had no recollection whether there had been any changes to Mr. Miller's psychiatric condition or treatment during this period. (Pl. Statement of Undisputed Facts, ¶ 36©; Def. Opposition to Pl. Statement of Undisputed Facts, ¶ 36©.)

Despite Plaintiff's requests for information regarding the benefits termination, Ms. Spoon declined to provide Plaintiff with any further information and instead referred him to the termination letter itself. (Pl. Statement of Undisputed Facts, ¶ 53.) Ms. Spoon did contact Dr. Bettes regarding Mr. Miller's information requests, and Dr. Bettes noted that he had reviewed the file and the documentation and believed that the termination was proper and satisfied the legal requirements of ERISA. (Id. ¶ 54, 55.)[7]

---

[6] Despite acknowledging that the precise factors that would have informed his decision to terminate Plaintiff's benefits would have been "fairly detailed," (Def. Statement of Material Facts, Ex. M, Bettes Dep. at 261), Dr. Bettes can no longer recall whether there were any changes in Plaintiff's medical condition that influenced his determination to terminate Plaintiff's benefits. (Def. Opposition to Pl. Statement of Undisputed Facts, ¶ 36(a).)

[7] According to American, it is the standard practice of AAMOHS and Ms. Spoon to refuse to provide pilots with further information beyond the termination letter. (Pl. Statement of Undisputed Facts, ¶¶ 57, 58.)

Plaintiff filed an appeal of the termination of his disability benefits with the Pension Benefits Administration Committee (the "Committee" or "PBAC") on November 30, 2006. (Id. at ¶ 60, Ex. 59.) In connection therewith, Plaintiff submitted a letter from Dr. Gonzalez that indicated Mr. Miller continued to be diagnosed with Anxiety Disorder NOS, R/O Generalized Anxiety Disorder with Soft Obsessive Compulsive Features, and S/P (Status Post) Brief Reactive Psychosis. (Id. at ¶¶ 61-62, Ex. 59 at AA 736-39.) In this letter, Dr. Gonzalez further noted that "Mr. Miller continues on active medical treatment through the faithful implementation of the stress management techniques he developed during his treatment with psychotherapy also through the faithful implementation of strict sleep hygiene measures." (Id., Ex. 59 at AA 738-39.) Dr. Gonzalez noted that although the treatment regimen had been successful in allowing Mr. Miller to avoid the need to resume use of psychotropic medications, the regimen would likely be a permanent necessity in order to preserve Mr. Miller's mental health and avoid a relapse given his "latent vulnerability." (Id.) Dr. Gonzalez also noted specifically that his letter was intended, at least in part, to "clarif[y] any intentional or unintentional misperceptions about" Mr. Miller's disability status. (Id.)

In addition to furnishing this letter from Dr. Gonzalez, Mr. Miller also submitted a statement on his own behalf in which he reiterated his experience of

continued anxiety disorder and history of psychosis, although Plaintiff did not bolster this statement with additional medical records other than that submitted by Dr. Gonzalez. (Pl. Statement of Undisputed Facts, ¶ 65; Def. Opp. to Pl. Statement of Undisputed Facts, ¶ 65.) Plaintiff also asserted that he was unable to qualify for FAA certification as a direct result of his diagnosis of psychosis and general anxiety disorder. (Pl. Statement of Undisputed Facts, ¶ 66.) Plaintiff's documentation offered in support of his appeal also indicated that he continued to be seen regularly by Dr. Gonzalez at the time his benefits were terminated, and that Dr. Gonzalez continued to monitor Mr. Miller's implementation of stress management and sleep hygiene measures. (Id. ¶ 68.)

On March 27, 2007, American sent a request to an outside medical evaluator, Western Medical Evaluators ("WME"), to review Mr. Miller's appeal and to resolve what American contended was a dispute regarding the existence of Mr. Miller's claimed disability. (Id. ¶ 69; Def. Opp. to Pl. Statement of Undisputed Facts, ¶ 69, Ex. Z, Letter from D. Jameson to WME dated March 27, 2007.) The request from American directed WME to "review all documents enclosed (referencing the Pilot LTD definitions and provisions, as well as all other medical and claim information) and advise if this Pilot is/continues to be disabled from his own occupation beyond 10.23.2006, providing evidence-based support

16

for your determination." (Id.)  The letter also inquired of WME whether "the evidence reflect[s] continuing presence of his psychiatric diagnoses."  (Id.)

Ms. Charlotte Teklitz, the individual charged with deciding Mr. Miller's appeal, testified during her deposition that these questions were intended to "obtain the information that [she] would need as a delegate of the PBAC to determine whether or not the pilot's disability continues or whether or not [the pilot has] wantonly disregarded appropriate medical care."  (Pl. Statement of Undisputed Facts, ¶ 71, Ex. E, Teklitz Dep. at 89:18-90:10.)  In furtherance of its review, WME was provided with several documents, including: (1) Mr. Miller's appeal submission; (2) American's "Job Description and Essential Functions" for Mr. Miller's position as a pilot; (3) Mr. Miller's medical records maintained by AAMOHS; and (4) potentially relevant provisions of the Plan.[8]  (Pl. Statement of Undisputed Facts, ¶ 72, Ex. 55 at AA 806; Ex. D (Def. Supp. Interrogatory Responses) # 17.)  As part of its review of Mr. Miller's appeal, WME did not conduct an in-person or telephone evaluation of Mr. Miller.  (Pl. Statement of

---

[8] According to American's "Job Description and Essential Functions" for Mr. Miller's position, qualifications for the position include, inter alia, the following: (1) "Capability of decision-making under stress"; (2) "The ability to adapt to diversified flight schedules, situations, or scenarios"; (3) "[A]daptable personality"; (4) the ability to "work varying hours of the day or night" and be "on duty for as long as twelve to fourteen hours . . . span[ning] many time zones and extreme weather differences in the course of a trip."  (Pl. Statement of Undisputed Facts, ¶ 83, Ex. 55 (Request for WME review) at AA 808-811.)

Undisputed Facts, ¶ 73; Ex. D (Def. Supp. Interrogatory Responses) # 17; Ex. E,

Teklitz Dep. at 86:19-87:17; Ex. 61 (Admissions), ¶ 20.)

WME furnished American with its report on April 20, 2007. (Pl. Statement

of Undisputed Facts, ¶ 74.) The report consisted of findings and opinions made by

Drs. Peter M. Crain and Coleman R. Seskind. In the report, Dr. Crain reviewed

generally the medical records that had been provided to WME, and noted that Mr.

Miller's treatment around the time that benefits were terminated consisted of

mental status monitoring, and also noted that Mr. Miller had been off of

psychiatric medication and had discontinued psychotherapy in 2000. Dr. Crain

concluded that the psychiatric records "show no evidence of continuing disability"

and he further stated that "Mr. Miller does not have overt evidence of a treatable

medical condition." (Id., Ex. 56, at AA 815-16.) Apparently for these reasons, Dr.

Crain could not "recommend an appropriate treatment at this time." (Id. at AA

816.) Acknowledging that he "[did] not have all of the facts concerning the

emotional stresses that led to the onset of Mr. Miller's psychosis," Dr. Crain

nevertheless *"assume[d]"* that now, after nine years, these issues have been dealt

with through psychotherapy." (Id.) (emphasis added.) Furthermore, Dr. Crain

acknowledged that because Mr. Miller had experienced an "apparent manic

psychotic episode" there exists "a risk that Mr. Miller could have another, under

18

circumstances similar to those that preceded the first." (Id.) Indeed, Dr. Crain opined that "[n]o amount of medical monitoring can prevent this from happening, except to begin active treatment right away to avert a full-blown psychosis." (Id.) Moreover, Dr. Crain agreed with Dr. Gonzalez that Mr. Miller's work schedule should be crafted to ensure that he obtained a "proper amount of sleep." (Id.) Notwithstanding his statement that only active treatment, implemented immediately, could effectively guard against a recurrent psychotic episode, Dr. Crain's offered an ultimate opinion that "[t]here is no evidence of a continuing mental disorder that requires treatment by a psychiatrist." (Id.)

Although "agree[ing] wholeheartedly with [Dr. Crain's] summary" of Mr. Miller's medical records, Dr. Seskind also contributed several of his own observations to the WME report. In this regard, Dr. Seskind noted that "[f]rom an AME Federal Aviation Standpoint," a pilot seeking a first-class airman medical certificate would have to satisfy the medical standard

> that there be no psychosis, which means that the individual has manifested delusions, hallucinations, grossly bizarre or disorganized behavior or other commonly accepted symptoms of his condition or the individual may reasonably be expected to manifest delusions, hallucinations, grossly bizarre or disorganized behavior or other commonly accepted symptoms of his condition.

(Id. at AA 817.) Having noted this standard, Dr. Seskind suggested that "it is

crucial to note" that Mr. Miller had "been off psychotherapy since 2003 and he has

been off psychoactive medication since the year 2000."[9] (Id.)  Without explaining

why this fact was crucial to a determination of whether or not Mr. Miller

continued to have a qualifying disability under the Plan, Dr. Seskind proceeded to

offer his opinion that it was inexcusable for Mr. Miller to have failed to attempt to

re-obtain his pilot certification:

> I find no evidence that he has attempted to regain his first
> class medical certificate.  My medical opinion is that while
> a senior AME would not be able to issue a medical
> certificate in such a case on his own, that the FAA might
> well favorably regard this gentleman as capable of flying
> under proper supervision.  At the very least, he could
> request a formal FAA approved medical examiner of
> psychiatric designation.  I have seen no such evidence.
> From a formal standpoint, he is therefore not really
> disabled and I would agree with Dr. Crain that there is no
> real evidence that he is disabled and incapable of
> performing his flight duties.

(Id.)  Noting that he personally had witnessed cases similar to Mr. Miller's receive

favorable treatment by the FAA,[10] Dr. Seskind opined that due to the passage of six

years since Mr. Miller's psychotic breakdown  – which he characterized as "the

distant past" – Dr. Gonzalez's treatment of Mr. Miller amounted to nothing more

---

[9]  In fact, Mr. Miller's medical records reflect that he has not taken psychoactive
medications since 2000, or approximately six years before his benefits were terminated.

[10]  In contrast to this general assertion, no American employee deposed in this case could
recall of a pilot ever regaining FAA certification after a diagnosis of psychosis.

than "monitoring the situation without formal treatment or administration of

psychiatric medicines." (Id.)

In their report, Drs. Crain and Seskind did not specifically discuss any of

American's "Job Description and Essential Functions" for Mr. Miller's position as

a pilot. (Pl. Statement of Undisputed Facts, ¶¶ 82, 84.)[11] Charlotte Teklitz, the

PBAC's delegate, attested that WME's evaluators were expected to consider the

specific job requirements for acting as a commercial airline pilot at American,

because "you can't determine whether or not someone's disabled from their job

without actually understanding what their job is." (Pl. Statement of Undisputed

Facts, ¶ 85, Ex. E (Teklitz Dep.) at 90:20-91:21.) In addition, Ms. Teklitz testified

that one of the factors she would consider in determining whether further review

beyond the WME report was appropriate in order to decide Mr. Miller's appeal is

whether she felt "that they [WME] had an adequate understanding of the plan and

how it works." (Pl. Statement of Undisputed Facts, ¶ 87, Ex. E (Teklitz Dep.) at

---

[11] Defendants purport to dispute this fact, but review of the report itself reveals that neither Drs. Crain or Seskind specifically addressed or discussed any of these qualifications. Similarly, neither reviewer addressed how Mr. Miller's diagnosis, condition, or ongoing treatment – which they characterized as little more than "monitoring" – were, or were not, relevant to the consideration of whether Mr. Miller qualified to serve as an active pilot. In denying this fact, Defendants appear to rely chiefly on the undisputed fact that American provided the evaluators with a copy of the job description for American pilots. The Court does not perceive how this fact compels the conclusion that Drs. Crain and Seskind considered the factors in relation to Mr. Miller's qualifications, particularly since the report they produced does not discuss any of the job requirements.

148:7-149:19.)  Furthermore, Ms. Teklitz testified that although she could not recall any specific circumstance where WME did not have an adequate understanding of the Plan, she noted that the Plan is "different from a typical loss of license insurance [plan] where if you don't have your FAA certificate you get a benefit" because "[i]n this case you have to be disabled from the occupation of pilot and the FAA certification is not specifically relevant."  (Pl. Statement of Undisputed Facts, ¶ 88, Ex. E (Teklitz Dep.) at 149:7-19.)  Ms. Teklitz also testified that if she or her colleagues believed there were any limitations in the WME report, including a failure to address a diagnosis, they would take steps to obtain further information, which may include following up with additional questions for WME, asking WME to address omitted information, or requesting an outside review by another specialist.  (Pl. Statement of Undisputed Facts, ¶ 91, Ex. E (Teklitz Dep.) at 92:5-14, 288:6-290:17.)  In the case of the WME evaluator's report concerning Mr. Miller, American took no steps to obtain further outside review by another specialist or to solicit corrections or clarifications to the WME report.  (Pl. Statement of Unisputed Facts, ¶ 92.)  During her deposition, Ms. Teklitz testified that she agreed that WME's conclusions were consistent with the terms of the Plan.  (Def. Statement of Undisputed Facts, ¶ 67, Ex. F (Teklitz Dep.) at 147-48.)

Mr. Miller's appeal of American's termination of his benefits was denied on May 22, 2007, or approximately six months after he filed his appeal. (Pl. Statement of Undisputed Facts, ¶ 93, Ex. 58.) The termination letter quoted the WME report in its entirety, summarizing in conclusion that "Western Medical Evaluators determined that the evidence presented does not document continuing disability beyond October 23, 2006, and does not document continued appropriate medical care and treatment for a condition giving rise to a disability. In view of this determination, AAMOHS' discontinuance of the Pilot's LTD benefits under the Plan was . . . proper . . . ." (Pl. Statement of Undisputed Facts, ¶ 94, Ex. 58 at AA 1030-1034.)

## III.  STANDARD OF REVIEW

### A.  SUMMARY JUDGMENT

Both parties have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby,</u> <u>Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. <u>Id.</u> at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. <u>Conoshenti v. Pub.</u> <u>Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." <u>Berckeley Inv. Group. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. <u>Celotex</u>, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see</u>

also, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

In making this determination, the Court must "consider all evidence in the light

most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>,

486 F.3d 791, 794 (3d Cir. 2007).

      B.     <u>ERISA</u>

      In <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), the

United States Supreme Court held that, in cases evaluating challenges to denial of

benefits in actions brought under 29 U.S.C. § 1132(a)(1)(B), district courts must

apply a de novo standard of review the plan administrator's decision, <u>unless</u> the

plan grants discretionary authority to the administrator or other fiduciary to

determine eligibility for benefits or otherwise interpret terms of the plan, in which

case courts should review the decision under the arbitrary and capricious standard.

In <u>Firestone</u>, the Court also stated that "if a benefit plan gives discretion to an

administrator or fiduciary who is operating under a conflict of interest, that

conflict must be weighed as a factor in determining whether there is an abuse of

discretion." <u>Id.</u> at 115.

The United States Court of Appeals for the Third Circuit subsequently

interpreted <u>Firestone</u> to suggest that courts should consider conflicts of interest

that affect plan administration when determining the appropriate standard of

review.  See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 392 (3d Cir.

2000).  In keeping with its interpretation of Firestone, the Third Circuit directed

that district courts employ a "sliding scale" of review, whereby the level of

deference accorded to plan administrator would change depending upon the

degree of conflict or conflicts of interest affecting the administration.  Id.

When Plaintiff brought this action, and at the time the parties filed their

cross-motions for summary judgment, Pinto's sliding scale approach remained

binding precedent within this circuit and courts were required to refer to this

decision in fashioning the applicable standard of review cases brought under 29

U.S.C. § 1129(a)(1)(B) challenging the denial or termination of benefits.

Accordingly, in their briefs, the parties expended considerable effort arguing for or

against a de novo or heightened arbitrary and capricious standard of review in this

case.  However,  intervening decisions issued by the United States Supreme Court

and the United States Court of Appeals for the Third Circuit have made clear that

Pinto's "sliding scale" approach is no longer valid.  See Metropolitan Life Ins. Co.

v. Glenn, – U.S. – , 128 S. Ct. 2343 (2008); Estate of Schwing v. The Lilly Health

Plan, 562 F.3d 522, 524-25 (3d Cir. 2009) ("[I]n light of Glenn, our 'sliding scale'

approach is no longer valid.").  Instead,

courts   reviewing   the   decisions   of   ERISA   plan

administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or fiduciary abused its discretion.

Schwing, 562 F.3d at 525. There is no dispute in this case that the American Plan grants discretion to the plan administrator. Hence, the Court will review the decision to terminate Plaintiff's benefits under an arbitrary and capricious standard of review, and will take into consideration any structural conflicts or other alleged errors relating to the termination, in determining whether the decision was arbitrary and capricious.[12]

The arbitrary and capricious standard requires that a court must not disturb a plan administrator's interpretation of a plan as long as it is reasonable. Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3d Cir. 1997). The Court must defer to the plan administrator unless the administrator's decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." Pinto v. Reliance Standard Life Ins.Co., 214 F.3d 377, 393 (3d Cir. 2000). However, such deference is not required if the decision is "clearly not supported

---

[12] The arbitrary and capricious standard of review followed in the Third Circuit "is essentially the same as the 'abuse of discretion standard.'" Abnathya v. Hoffman-La Roche, 2 F.3d 40, 45 (3d Cir. 1993) (citing Nazay v. Miller, 949 F.2d 1323, 1336 (3d Cir. 1991)).

by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 41 (3d Cir. 1993).

## IV.  **DISCUSSION**

Plaintiff has identified a number of alleged procedural and substantive irregularities in Defendants' handling of his claim, his benefits termination, and subsequent denial of his appeal, which he contends compels the Court to find the benefits termination to be arbitrary and capricious as a matter of law. Accordingly, Plaintiff prays for the Court to vacate the termination of his benefits, direct retroactive restoration and payment of Plaintiff's long-term disability benefits with interest, and order Defendants to pay Plaintiff's attorneys' fees and costs.  In contrast, Defendants dispute the procedural and substantive irregularities that Plaintiff claims exist and, even assuming one or more of such irregularities occurred, Defendants argue that they do not compel a finding in Plaintiff's favor.

Upon consideration of the factual record and the parties' briefs filed in support of, and opposition to, the pending cross-motions for summary judgment, it is recommended that the Court find that Defendants' termination of Plaintiff's long-term disability benefits under the Plan suffered from procedural infirmities and substantive deficiencies that collectively render the ultimate decision arbitrary and capricious.  Accordingly, for the reasons discussed in greater detail below, it is recommended that the Court grant Plaintiff's motion for summary judgment, deny Defendant's cross-motion for summary judgment, and vacate Defendants'

29

termination of Plaintiff's long-term disability benefits under the Plan.

Additionally, it is recommended that the Court enter an order directing the

retroactive reinstatement of Plaintiff's benefits under the Plan, with interest.

**A.    Plaintiff's Benefits Were Terminated Based Upon the Conditions and Treatment that Had Previously Been Found to Support an Award of Benefits, and Which Were Found Sufficient to Resume Plaintiff's Benefits Payments After They Had Been Suspended.**

As an initial matter, American acknowledges that Defendants "cannot

determine from the medical documentation produced by Plaintiff and his treating

physician whether there was any change that occurred in Plaintiff's psychiatric

condition or treatment [between January 2003 and May 2007." (Pl. Statement of

Undisputed Facts, ¶ 36(a).) American's medical personnel who were involved in

reviewing Plaintiff's file and in assessing his qualification to receive benefits

under the Plan were unable to identify any changes to Plaintiff's psychiatric

condition or treatment that precipitated American's decision to terminate

Plaintiff's benefits. (Id. ¶ 36(b), (c).) Defendants admit as much, but argue that

this fact is irrelevant because there is no evidence that any of their medical

personnel actually undertook a meaningful review of Plaintiff's eligibility for

benefits at any time prior to the decision to terminate his benefits in 2006.

Additionally, Defendants go further and argue that the medical documentation

Plaintiff had submitted, and which had been found sufficient to qualify Plaintiff

for benefits for several years, actually showed that Plaintiff was not disabled and

had not been for some time.  Essentially, Defendants suggest that Plaintiff was not

only unqualified to receive benefits as of 2006 when American initially terminated

his benefits, but he had actually been unqualified for a considerable period of time

and that this fact somehow had gone undetected.

Defendants' argument is unpersuasive.  Plaintiff's medical file reveals that

his continued receipt of benefits was the subject of frequent oversight and internal

review by American personnel, with notes in the file indicating that after he was

initially awarded long-term disability benefits in November 1999 due to his

"medical inability to act as a Pilot," (Pl. Statement of Undisputed Facts, Ex. 49,

letter dated Nov. 2, 1999), Plaintiff continued to receive the benefits until May

2003, when American suspended payments pending confirmation of Plaintiff's

qualifications.  After Plaintiff and his doctor submitted documentation in support

of his petition to have his benefits resumed, on which American apparently relied,

qualified American personnel determined that Plaintiff's benefits should be

reinstated or resumed because he was deemed medically qualified under the Plan.

(Id., Ex. 47.)[13]  Regardless of the inability of American's personnel to recall conducting substantive review of Plaintiff's at the time of their depositions in this action, the handling of Plaintiff's benefits management shows that he was routinely requested to submit documentation in support of his continued (or resumed) receipt of benefits, and that he and Dr. Gonzalez did continue to provide such information to American.

Nevertheless, in 2006, without having received or reviewed any new information that differed in material respect from that relied upon to continue Plaintiff's benefits payments for a considerable period of time, American abruptly determined that it could not longer verify Plaintiff's continued disability.  Courts have found that similar abrupt reversals of benefits determinations may constitute significant procedural irregularity that may support finding an administrator's benefits determination to be arbitrary and capricious.  See, e.g., Harrison v.

---

[13]  The document authorizing the resumption of Plaintiff's benefits payments bears the verification of Dr. Thomas Bettes and indicates that Plaintiff "[m]edically qualifies for disability pension program" and instructed that American "reinstate benefits with no break in disability payments."  (Pl. Statement of Undisputed Facts, Ex. 47.)  Although the initial letter notifying Plaintiff that he was deemed qualified to receive benefits stated generally that the reason was his "medical inability to act as a pilot," the document triggering the resumption of Plaintiff's benefits payments states that the medical condition warranting a disability pension was brief reactive psychosis.  (Id.)  Thus, following a brief suspension of payments, as of July 15, 2003, American deemed Plaintiff medically qualified to receive benefits.  As noted, American officials could not identify any change in Plaintiff's medical condition following this point, but nevertheless concluded in 2006 that he was no longer qualified, in part because American claimed to be unable to verify his continued disability.

Prudential Ins. Co., 543 F. Supp. 2d 411, 421 (E.D. Pa. 2008) (finding administrator's decision arbitrary and capricious based on myriad procedural errors and the fact that the decision was not predicated on new medical information, but instead relied on essentially the same evidence relied upon in granting benefits and in renewing them); Thorpe v. Continental Cas. Co., No. 01-5932, 2002 WL 3185876, *4 (E.D. Pa. 2002); see also McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").

Defendants argue that these cases are inapposite because each involved medical records that revealed a continued disability that the administrators ignored, whereas in Plaintiff's case his own doctor had submitted documents indicating that Plaintiff had been asymptomatic and was capable of returning to work. The Court appreciates Defendants' argument, and the distinctions Defendants attempt to draw between Plaintiff's case and the cases cited, but ultimately finds the argument unavailing. Indeed, the Court agrees with Plaintiff that Defendants' position on this point appears to be substantially an example of

counsel's *post hoc* rationalization in support of the client's decision to terminate benefits rather than evidence of Defendants' actual reasons for concluding that Plaintiff no longer qualified to receive them – especially considering that none of Defendants employees appear to have any meaningful memory of the process that lead to Plaintiff's benefits being terminated, or the specific reasons that supported their decision.

The Court's finding in this regard is strengthened by the fact that Defendants never provided Plaintiff with any meaningful explanation regarding either the <u>specific</u> reasons for the adverse determination – reached after years of finding Plaintiff qualified to receive benefits – or the fact that it appears to have been based entirely (or nearly so) on the very documentation that Plaintiff had furnished and which had apparently been used to maintain Plaintiff's benefits approval between 2003 and 2006.

Aside from an instruction that in order to receive favorable reconsideration of his application he would need to demonstrate his efforts to reapply for FAA certification – a consideration Defendants acknowledge is not a requirement under the Plan to receive benefits – Plaintiff was provided essentially no guidance as to why he was deemed unqualified after years of having been approved. Not only does this substantially call into question the initial termination decision, but it

substantially prejudiced Plaintiff's efforts to challenge the decision because he was left literally to guess at what documentation Defendants would require him to submit in order to reverse their adverse decision on appeal. Moreover, the prejudice to Plaintiff from this lack of information was compounded by the fact that in terminating Plaintiff's benefits, Defendants relied on the same medical records and documents that had previously supported the continuation of benefits.[14] Plaintiff was provided no information that would have enabled him or his treating physician to counter these findings by, for example, explaining the prior records and offering other targeted information in support of Plaintiff's claim that he remained disabled, was receiving treatment appropriate for his diagnosed conditions, and otherwise remained qualified to receive long-term disability benefits in accordance with the terms and requirements of the Plan. For the foregoing reasons, it is recommended that the Court conclude that Defendants'

---

[14] The Court is not suggesting that benefits determinations can never be changed or corrected upon the discovery of error or changed circumstances, nor is the Court implying that a plan administrator is precluded from relying upon existing medical documentation in a beneficiary's file to support a finding that the beneficiary is no longer qualified. In this case, however, Plaintiff was provided no specific or meaningful explanation at all regarding the reason for the adverse determination and, indeed, was informed that the benefits reversal was due in part to the failure of Plaintiff to pursue his FAA certification – something that the Plan does not require in order to qualify for disability benefits. In the context of this case, and the fact that the very information had been found for years to support the continuation of benefits, it is submitted that Defendants reliance upon no new information or changed circumstances to support their decision to terminate Plaintiff's benefits was arbitrary and capricious.

reliance upon Plaintiff's existing records, and failure to provide any explanation or guidance to Plaintiff as to why such records were now deemed to support the termination of his benefits, constitutes procedural error in the context of Plaintiff's case and amounted to an arbitrary and capricious initial denial of benefits.

**B.    Defendants Failed to Provide Plaintiff With Sufficient and Accurate Information Regarding the Specific Bases for the Termination of Benefits.**

Defendants' failure to provide Plaintiff with any specific information about the decision to terminate his benefits was not only prejudicial within the context of Plaintiff's fiduciary relationship with Defendants and his long-term receipt of benefits under the Plan, but it was also deficient under the regulations governing ERISA claim denials.  Under these regulations, Defendants were required to provide, "in a manner calculated to be understood by the claimant . . . (I) The specific reason or reasons for the adverse determination . . . [and] (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary . . . ." 29 C.F.R. § 2560.503-1(g) (emphasis added).  In this case, the letter notifying Mr. Miller that his benefits were being terminated noted little more than American's statement that it was "unable to verify either the existence of a continuing medical disability" or his "continued substantial progress towards

obtaining [his] FAA medical certification." (Def. Statement of Material Facts, Ex.

AG, Termination Letter AA 762.)

Whereas the termination letter was especially general in noting American's

finding that it could not verify his continued medical disability, the letter offered

misleading specificity by advising Mr. Miller that "[i]n order to receive further

favorable consideration, you will need to demonstrate that you are actively

pursuing your FAA medical certification." (Id.) This direction constitutes

virtually the only guidance given to Mr. Miller for how he might go about

obtaining a reversal of the adverse benefits determination.[15] However, as noted

above, nothing in the Plan imposes the pursuit of FAA certification or

recertification as a qualification for receiving long-term disability benefits. Yet, in

the termination letter, this represents the most specific reason identified for

Defendants' decision to terminate Plaintiff's benefits. Furthermore, evidence that

he was actively pursuing his FAA certification was the only guidance given for

how Plaintiff could obtain a favorable ruling on his benefits application in the

future. Not only is it true that a plan administrator "may not controvert the plain

language of the [plan] document," Dewitt v. Penn-Del Directory Corp., 106 F3d

---

[15] Plaintiff was also advised about how to go about filing an appeal with the PBAC, including a statement informing him that he "should submit all information and documentation that you believe pertinent to your appeal . . . ." (Id., AA 763.)

514, 520 (3d Cir. 1997), but it is impermissible for a plan administrator to imply an additional requirement that is not specified in the plan documents. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997). Indeed, the Third Circuit has expressly held that it is arbitrary and capricious to do so. Id.; see also Epright v. Envtl. Res. Mgmt., Inc. Health & Welfare Plan, 81 F.3d 335, 342 (3d Cir. 1996) (when trustees of a plan impose standards not required by the plan itself, they act arbitrarily).

This conclusion is reinforced by the fact that when Plaintiff inquired with American about why his benefits were being terminated and what steps he needed to take in order to have his benefits reinstated, he was simply referred to the termination letter itself. As noted, the letter itself provided virtually no information to explain why benefits were being terminated after years of having been approved, and it provided, at most, misleading information about what Plaintiff needed to do in order to obtain favorable consideration of his claim in the future. Other courts within the Third Circuit have found that the failure to provide any meaningful response to a plan participant's inquiry may, in certain circumstances, be unreasonable. See Lamanna v. Special Agents Mutual Benefits Assoc., 546 F. Supp. 2d 261, 301 (W.D. Pa. 2008) (acknowledging that an insurer had no obligation to gather information itself in support of a participant's claim

but finding it "unreasonable that when a participant inquires as to what evidence she needs to provide in order to satisfy the decision maker that she is totally disabled , the purported answer to that question is, at best, evasive and non-responsive."); Fiorentino v. PNC Bank Corp. & Affiliates Long Term Disability Plan, No. 03-3417, 2004 WL 1813221, *10-11 (E.D. Pa. July 19, 2004).  In this case, Defendants' misleading termination letter was not only deficient, but the failure to provide Plaintiff with any meaningful response to his inquiry into the reasons for the adverse decision and the steps he would need to take on appeal was unreasonable and served to further compound the error.  Indeed, by referring Plaintiff back to the original termination letter, Defendants were directing Plaintiff to a document that specifically instructed him to take steps that were not even required under the Plan to qualify for disability benefits.

For the foregoing reasons, it is recommended that the Court find the initial termination decision to have been arbitrary and capricious because one of the two bases identified for terminating Plaintiff's benefits – and, indeed, the only clearly articulated basis given – does not constitute a basis for termination of benefits under the Plan.[16]  Additionally, the termination letter provided Plaintiff with no

---

[16]  Indeed, Charlotte Teklitz, the PBAC's delegate, testified that ". . . the Plan has no requirement . . . for the pilot to continue to try to get their FAA designation . . . . In this case [under American's Plan] you have to be disabled from the occupation of pilot, and the FAA

meaningful guidance with respect to the information necessary to support his claim on appeal, with the notable exception of specifically advising him that he would need to present evidence of his continued pursuit of recertification – a requirement not actually imposed by the Plan itself.[17]

### C. Western Medical Evaluators Failed to Address or Evaluate Plaintiff's Anxiety Diagnosis and Treatment and the PBAC Did Not Seek Clarification Regarding WME's Analysis.

Review of the WME report authored by Drs. Crain and Seskind indicates that both reviewers devoted all or nearly all of their brief analysis to Plaintiff's 1998 psychotic episode and appear to have given virtually no attention to Plaintiff's continued anxiety disorder, which was also diagnosed in 1998 at the

---

certification is not specifically relevant." (Pl. Statement of Undisputed Facts, ¶¶ 131-32.) Notwithstanding this asserted irrelevance, the termination letter clearly demonstrates that Plaintiff's alleged failure to pursue recertification with the FAA was a principal basis given for the initial termination decision. Moreover, pursuit of FAA certification was the only guidance Plaintiff was given with respect to the steps he needed to take to obtain favorable consideration of his benefits application. As will be noted, the WME outside evaluators also relied substantially upon this factor and it appears clearly to have driven their ultimate decision to recommend denying Plaintiff's appeal.

[17] Defendants urge the Court to discount or disregard this lack of guidance – and the inclusion of misleading guidance – because Plaintiff and his doctor did, in fact, submit documentation in support of Plaintiff's appeal. It is recommended that the Court decline Defendants' invitation to overlook these procedural defects because Defendants have provided no support for the assertion that the failure to comply with ERISA regulations can be excused if an aggrieved plan participant pursues an appeal and submits documents in support thereof in the absence of required information from the plan administrator. Furthermore, Plaintiff has countered Defendants' unsupported assertion with cases and regulatory guidance to show that ERISA regulations do not recognize a doctrine of substantial compliance to overcome procedural violations. (See Doc. 65 at 13-16.)

same time of his diagnosis with brief reactive psychosis, and about which Dr. Gonzalez specifically attested in his letter to the PBAC submitted in support of Mr. Miller's appeal. Although both reviewers offered a very general conclusion that Plaintiff did not have a "continuing medical disorder that required treatment by a psychiatrist" and, therefore, "is not disabled from his occupation as a Pilot," neither doctor appear to have considered in any way this longstanding diagnosis and Plaintiff's continued treatment of the condition.

There is case law from the Third Circuit indicating that the failure to consider one of a plan participant's diagnoses is arbitrary and capricious. See Kosiba v. Merck, 384 F.3d 58, 68-69 (3d Cir. 2004); Lamanna v. Special Agents Mutual Benefits Assoc., 546 F. Supp. 2d 261, 298 (W.D. Pa. 2008) (citing Kosiba and noting that "if a reviewing court errs by failing to address a plaintiff's multiple conditions, the court should give little deference to a plan administrator's decision which also fails to take multiple conditions into account."). That case law applies to the failure of American, WME, or the PBAC to give meaningful attention to Plaintiff's diagnosis and treatment for Anxiety Disorder NOS.

In this case, there is little in the WME report to suggest that the reviewing physicians considered Plaintiff's anxiety diagnosis and treatment in any meaningful way, despite this diagnosis having been a consistent part of Plaintiff's

file since he first applied for disability benefits and for which he was being

monitored by Dr. Gonzalez for years. Defendants disagree with this, asserting that

because the evaluators offered an ultimate conclusion that Plaintiff was no longer

disabled from his occupation as a pilot or otherwise suffered from a continuing

mental disorder requiring treatment by a psychiatrist, it is implied that the

evaluators did consider this diagnosis. Review of the report itself does not support

Defendants' broad interpretation of the evaluators' analysis. The WME report

reveals almost no recognition of Plaintiff's diagnosis with anxiety, and entirely no

assessment of how Plaintiff's anxiety diagnosis and stress management techniques

would bear upon his ability to function as an airline pilot in accordance with the

essential job functions that American identified.[18]

---

[18] Dr. Crain was dismissive of Plaintiff's treatment regimen of "mental status monitoring" and attention to sleep hygiene, which Dr. Gonzalez had prescribed to address and manage Plaintiff's anxiety. (Pl. Statement of Undisputed Facts, Ex. 56 at AA 815.) By way of example, Dr. Crain offered that "[b]y now, I would expect Mr. Miller to know what he requires for adequate sleep hygiene, without being reminded by the psychiatrist." (Id.) Indeed, the reviewing physicians focused their analysis considerably on the fact that Plaintiff had not experienced a subsequent psychotic episode since the precipitating event in 1998, the fact that he had not been prescribed psychotropic medications since 2000, and the fact that he had remained asymptomatic for much of the time he had been receiving disability benefits. Clearly, such considerations have special relevance to Plaintiff's case, but not at the exclusion of any consideration of Plaintiff's ongoing anxiety diagnosis and treatment. The Court recognizes that in certain of his correspondence to American prior to Plaintiff's benefits being terminated in 2006, Dr. Gonzalez represented that he was asymptomatic and even capable of returning to work as a pilot. However, the WME reviewing physicians appear to have discounted Dr. Gonzalez's letter offered in support of Plaintiff's appeal in which he attempted to clear up any residual confusion over his assessment of Plaintiff's disability status, and in which he explained that Plaintiff continued to be diagnosed with anxiety and was practicing sleep hygiene and stress

Defendants also attempt to minimize the importance of this lack of attention to Plaintiff's anxiety diagnosis and treatment by asserting that his disability benefits were granted only on the basis of his diagnosis with brief reactive psychosis. Although psychosis is identified as the given basis for the initial benefits determination, American's letter to WME requesting outside evaluation appears to have contemplated that all of Plaintiff's ongoing diagnoses were to be considered for eligibility purposes. (Def. Opp. to Pl. Statement of Undisputed Facts, ¶ 69, Ex. Z, Letter from D. Jameson to WME dated March 27, 2007.) The request from American directed WME to "review all documents enclosed (referencing the Pilot LTD definitions and provisions, as well as all other medical and claim information) and advise if this Pilot is/continues to be disabled from his own occupation beyond 10.23.2006, providing evidence-based support for your determination." (Id.) The letter also inquired of WME whether "the evidence reflect[s] continuing presence of his psychiatric *diagnoses*." (Id.) (emphasis added.) The lack of substantive attention to the ongoing diagnosis of anxiety contravenes American's instruction. The penultimate evaluative paragraph of Dr. Crain's letter focuses exclusively on the fact that Plaintiff had not

management in an effort to control the condition – efforts that appear to have been largely successful.

experienced a subsequent psychotic breakdown and on Dr. Crain's assumption that the stresses that led to Mr. Miller's psychosis have "after nine years ... been dealt with through psychotherapy." (Pl. Statement of Undisputed Facts, Ex. 56, at AA 816.) Apparently based upon this assumption, Dr. Crain offered his belief that American could assume responsibility for monitoring Mr. Miller's mental status "perhaps twice a year." (Id.) Dr. Crain's final evaluative paragraph is similarly focused on the risk of another psychotic event, and Dr. Crain's assessment that such risk could be managed and kept relatively low. Nothing in the paragraph addresses the existence of Plaintiff's anxiety disorder or how it might affect his ability to function as a pilot.

For his part, Dr. Seskind ignored entirely Plaintiff's anxiety diagnosis and Dr. Gonzalez's management thereof, as his contribution to the report focused on Plaintiff's original psychosis, the fact that he had been off of psychotropic medication and psychotherapy for several years, and – notably – the fact that Plaintiff had not sought his FAA certification. Indeed, Dr. Seskind predicates his conclusion that "from a formal standpoint, [Mr. Miller] is . . . not really disabled" on the fact that he had not seen any evidence that Plaintiff had "requested a formal FAA approved medical examiner of psychiatric designation" as part of an effort to regain his first-class medical certificate. (Id. at AA 817.) In a somewhat oblique

reference to Dr. Gonzalez's care, Dr. Seskind did offer his conclusion that Dr.

Gonzalez was doing nothing more than "monitoring the situation," but it appears

that the "situation" Dr. Seskind was referring to was the psychotic episode itself,

as his "monitoring" comment was offered in the context of Plaintiff's initial

psychotic episode and subsequent diagnosis, something that he characterized as

"the distant past of at least six years . . . ." (Id.)  As with Dr. Crain, Dr. Seskind

indicated no consideration of Plaintiff's anxiety diagnosis that would support his

ultimate conclusion that there was "no evidence [of any] continuing mental

disorder . . . ." (Id.)

Although the PBAC had requested that WME address Mr. Miller's

"psychiatric diagnoses," the report of Drs. Crain and Seskind provides insufficient

indication that either doctor gave meaningful consideration to Plaintiff's diagnosis

with Anxiety Disorder NOS and the treatment that Plaintiff had been receiving as

a result – treatment that appears to have been successful in helping Plaintiff to

remain asymptomatic for a considerable period of time.  The PBAC did not seek

further clarification of this salient issue regarding Plaintiff's qualification to

receive long-term disability benefits but instead appears to have simply accepted

the report as filed.  It is recommended that the Court find that this failure to

address Plaintiff's anxiety diagnosis and treatment as part of reaching the ultimate

conclusion to uphold American's termination of Plaintiff's benefits to have been arbitrary and capricious.

**D.    Neither WME nor the PBAC Adequately Addressed the Requirements of Plaintiff's Job as a Pilot in Concluding that He was not Disabled.**

Although the WME's reviewing physicians concluded that Plaintiff was not disabled, they appear to have reached this conclusion without analyzing whether Plaintiff was actually capable of fulfilling the job requirements that American itself prescribed as necessary in order to function as a pilot.  Among the requirements and duties of serving as a commercial airline pilot, American identified the following:

- "Capability of decision-making under stress";

- "The ability to adapt to diversified flight schedules, situations, or scenarios";

- "Adaptable personality"; and

- Ability to "work varying hours of the day or night" and be "on duty for as long as twelve to fourteen hours . . . span[ning] many time zones and extreme weather differences in the course of a trip."

(Pl. Statement of Undisputed Facts, ¶¶ 84-84, 94-95.)  Courts have, in certain circumstances, found that the failure to consider actual job requirements may be arbitrary and capricious.  See, e.g., Lamanna, 546 F. Supp. 2d at 295-97; Witte v.

46

Connecticut General Life Ins. Co., No. 06-2755, 2007 WL 4300224, at *4-6

(D.N.J. Dec. 6, 2007). When considered in the context of the other deficiencies

identified in WME report and American's own review of Plaintiff's qualification

for benefits, it is submitted that the failure to consider the specific job

requirements that American itself had identified as necessary for its pilots to

satisfy was improper. Given the particular and substantial demands that are

included among the job requirements for an American pilot, the obvious relevance

that these requirements have in the context of determining an application for "own

occupation" disability benefits, and the sleep and stress management regimen that

Plaintiff, Dr. Gonzalez, and even WME's evaluators seems to agree was necessary

for Plaintiff, it is recommended that the Court find WME's and, subsequently, the

PBAC's failure to have focused any specific attention on these requirements to be

arbitrary and capricious.

### E.    Other Considerations

Plaintiff makes a number of other arguments in favor of his claim that Defendants' decision to terminate his disability benefits under the Plan was arbitrary and capricious, but the Court finds it unnecessary to address them in this report.  The Court has identified and discussed what it has found to be the most significant examples of American acting arbitrarily and capriciously in terminating Plaintiff's benefits and in the subsequent review of the termination decision.  In closing, however, the Court finds it appropriate to note its disagreement with Defendants' argument that the PBAC was bound to accept the clinical findings reached by WME.  Defendants insist that this is so based on the following plan provision:

> (e) Any dispute as to the clinical validity of a Member's claim of the existence of a Disability or the continuation of the illness or injury which gave rise to such Disability shall be referred to a clinical authority selected by agreement between the Company and the Association, and the findings of such authority regarding the nature and extent of such illness or injury shall be final and binding upon the Administrator, the [Allied Pilots] Association and the Member and his Beneficiaries.  The cost of referral of a dispute to a clinical authority pursuant to this paragraph, including the cost of all examinations or proceedings in connection therewith, shall be shared equally by the Company and the [Allied Pilots] Association . . . .

(Def. Statement of Undisputed Facts, Ex. A at AA 122.)  Apparently in reliance

upon this language, Defendants seem argue that the PBAC was duty bound to accept the WME evaluators' conclusions even if they: (1) were reached without adequate consideration of, among other things, the specific job requirements and an assessment of whether Plaintiff could meet those requirements; (2) were based upon a substantial and improper reliance on the asserted fact that Plaintiff had unreasonably failed to seek FAA recertification, even where such action was not a prerequisite under the Plan and was not relevant to a determination regarding Plaintiff's disability status; or (3) were rendered without any meaningful consideration of Plaintiff's longstanding anxiety diagnosis and his continued treatment therefor as part of a comprehensive assessment of Plaintiff's multiple diagnoses that the PBAC specifically sought from WME.[19]

It is submitted that the Court should not overlook these procedural and substantive deficiencies simply because certain language in the Plan makes clinical determinations by an outside evaluator binding upon the PBAC. Defendants do not argue, and the Court does not find, that this language in the

---

[19] Furthermore, the PBAC's delegate, Charlotte Teklitz, testified that she will request further review, correction, or clarification of an outside evaluator's report where that report is deficient. (Pl. Statement of Undisputed Facts, ¶ 91.) This fact tends to undermine Defendants' argument that the PBAC was simply obligated to rubber stamp the WME's findings and conclusions. It is also further indication of that the review of Plaintiff's appeal was inadequate given the errors that have been identified and which were not addressed during the course of Plaintiff's appeal.

Plan overrides the requirements of ERISA. Nor does this language trump the overarching requirement that the ultimate determination regarding Plaintiff's disability status and qualification for benefits under the Plan be reached neutrally and not be the result of arbitrary and capricious decision-making. It is recommended that the Court conclude that the PBAC was not bound to accept wholesale WME's report because it was affected by errors identified above. It is further recommended that the Court find that the ultimate decision to terminate Plaintiff's long-term disability benefits under the Plan was arbitrary and capricious due to the procedural and substantive deficiencies identified and discussed throughout this report and recommendation.

## V.    CONCLUSION

For the reasons discussed above, it is **RECOMMENDED** that the Court find that Defendants' termination of Plaintiff's long-term disability benefits under the Plan was arbitrary and capricious. It is further **RECOMMENDED** that Plaintiff's motion for summary judgment (Doc. 38) be **GRANTED**, that Defendant's cross-motion (Doc. 44) be **DENIED**, that judgment be entered in Plaintiff's favor, and that the Court order the retroactive reinstatement of Plaintiff's long-term disability benefits, with interest.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within ten (10) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 30th day of November 2009.

**_S/Martin C. Carlson_**
**United States Magistrate Judge**