# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT T. MILLER<br><br>Plaintiff,<br>v.<br>AMERICAN AIRLINES, INC., et al.,<br><br>Defendants. | CIVIL ACTION NO. 3:08-CV-277<br><br>(JUDGE CAPUTO)<br>(MAGISTRATE JUDGE CARLSON) |

## MEMORANDUM

Presently before the Court is Magistrate Judge Carlson's Report and Recommendation ("R&R") recommending that Plaintiff Robert T. Miller's motion for summary judgment be granted and that Defendants' motion for summary judgment be denied. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## BACKGROUND

Plaintiff was employed as a commercial airline pilot with Defendant American Airlines, Inc. ("American") between 1989 and 1998. (Doc. 40 at ¶ 1.) In August 1998, while acting as co-pilot, Plaintiff's mental state became unstable and his airplane had to be taxied back to terminal; Plaintiff had to be removed from the cockpit, and was committed to a psychiatric hospital and diagnosed with "severe psychosis." (*Id.* at ¶¶ 2-5.) Upon discharge, Plaintiff began treating with a psychiatrist, Dr. Abel Gonzalez, who diagnosed Plaintiff with Anxiety Disorder NOS, R/O Generalized Anxiety Disorder with Soft Obsessive Compulsive Features and S/P (status post) Brief Reactive Psychosis. (*Id.* at ¶ 7.)

As a result of Plaintiff's condition, he applied for, and qualified for, long-term disability

benefits ("LTD benefits") pursuant to the American Airlines, Inc. Pilot Retirement Benefit Program Fixed Income Plan ("the Plan"); Plaintiff began receiving LTD benefits in 1999. (Doc. 46, Ex. Z.) The plan grants the American Airlines Inc., Pension Benefits Administration Committee ("the PBAC") fiduciary responsibility to "decide questions concerning the application or interpretation of the Plan . . . including, but not limited to determinations of eligibility for benefits. (American Airlines Pilot Retirement Benefit Program at 11.3(c)(iii), Doc. 46, Ex. A.)

The Plan defines "Disability" as "an illness or injury, verified through qualified medical authority . . . which prevents a Member from continuing to act as an Active Pilot Employee in the Service of the Employer." (Pilot Retirement Benefit Program at 2.1(af), Doc. 46, Ex. A.) As amended in 2004, the plan states that a Member's disability will be considered to have ceased to exist if "verification of such Disability can no longer be established." (Pilot Retirement Benefit Program at 5.4(c)(ii), Doc. 46, Ex. A.) Any disability under the plan is subject to re-verification every ninety (90) days, where appropriate. (Pilot Retirement Benefit Program at 5.4(d), Doc. 46, Ex. A.) In the case of a dispute regarding "the continuation of the illness or injury," the claim "shall be referred to a clinical authority selected by agreement between [American] and the [Pilots' Union], and the findings of such authority regarding the nature and extent of such illness or injury shall be final and binding upon the Administrator, the [Pilots' Union] and the Member and his Beneficiaries." (Pilot Retirement Benefit Program at 5.4(e), Doc. 46, Ex. A.). The cost of review by the agreed-upon clinical authority is shared equally between American and the Pilots' Union. (Pilot Retirement Benefit Program at 5.4(e), Doc. 46, Ex. A.)

Between 1999 and 2003, Plaintiff received his LTD benefits. (Doc. 40, ¶ 9.) On

February 10, 2003, American's Director of Occupational Health Services, Dr. Thomas Bettes, wrote Plaintiff a letter that assigned Jeanne Spoon, R.N., as the case manager for his LTD benefits case and requested updated medical records from Plaintiff's treating physician. (Doc. 46, Ex. AA.) On May 7, 2003, Dr. Bettes wrote a letter to Paul Barry, the Managing Director for Flight Operations, stating that he had been unsuccessful in his attempts to contact Plaintiff for further medical information regarding his disability and recommending suspension of further benefits. (Doc. 46, Ex. AC.)

Dr. Gonzalez wrote a letter to Ms. Spoon on June 10, 2003, stating that he had been following up with Plaintiff's psychiatric treatment since 1998. (Doc. 46, Ex. K.) He stated that Plaintiff's use of medication and psychotherapy had ended in 2000 and Plaintiff "ha[d] been asymptomatic and able to safely return to his usual work since spring of 2001." (*Id.*) On July 15, 2003, Plaintiff was deemed "medically qualified for the disability pension program" and his benefits were reinstated.[1] (Doc. 46, Ex. AD.)

On August 26, 2005, Dr. Gonzalez sent another letter to the American Airlines Medical Department noting that Plaintiff was not taking psychotropic medications and that "[h]is condition is stable and he is completely a symptomatic (sic) without any ongoing or active treatment." (Doc. 46, Ex. L.) Dr. Gonzalez's progress notes from June 13, 2006, note that Plaintiff was "asymptomatic" and that there was "no treatment necessary." (Doc. 46, Ex. W.) On September 1, 2006, Dr. Gonzalez's progress notes stated that Plaintiff was "[i]n general asymptomatic." (Doc. 59, Ex. R.)

---

[1] At his deposition, Dr. Bettes testified that reinstatement of benefits can sometimes be an administrative action that does not necessarily require a medical review of the claimant's file. (Bettes Dep. 162:18-21, Aug. 25, 2008).

3

On September 21, 2006, Ms. Spoon wrote Plaintiff a letter alerting him that, pursuant to the plan's allowance for re-verification every ninety (90) days, his medical file had been reviewed for continued medical disability. (Doc. 46, Ex. AH.)The letter said that the American Airlines "medical doctor has requested an update in order to verify your disability status" and asked Plaintiff to have his treating doctor send updated medical information within thirty (30) days. (*Id.*)

On October 23, 2006, Dr. Bettes sent Plaintiff a letter stating that his LTD benefits would be discontinued because American was "unable to verify either the existence of a continuing medical disability or your continued substantial progress towards obtaining your FAA medical certification." (*Id.*) The letter added that "[i]n order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing obtaining your FAA medical certification." (*Id.*) Notably, obtaining or pursuing FAA medical certification is not a requirement for receiving LTD benefits under the plan. (Teklitz Dep. 144:14-16, Aug. 28, 2008.) The letter also stated that "verification of your continued disability cannot be established and your disability benefits under the Plan will end immediately upon notification of this status to the Flight Office." (Doc. 46, Ex. AH.) The letter also informed Plaintiff of his right to appeal the decision, included the pertinent language from the plan regarding the appeals process, and advised him to "submit all information and documentation you believe pertinent to your appeal." (*Id.*)

Plaintiff filed his appeal to the PBAC on November 30, 2006. (Doc. 46, Ex. AH.) Additional evidence submitted by Plaintiff included a letter from Dr. Gonzalez dated November 22, 2006. (*Id.*) Dr. Gonzalez wrote that Plaintiff "has been continually and permanently disabled from obtaining a Class One Medical Certificate as required by F.A.A.

4

regulations since August of 1998." (Doc. 46, Ex. Y.) The letter added that Plaintiff's "diagnosis reveals and refers to latent vulnerability on his mental status so that prevention and medical treatment, when adequate, may be sufficient. However, no medical treatment has the capacity to neither revert, undo, nor cure such condition." (Doc. 46, Ex. Y.)

On March 27, 2007, American requested that a peer review be performed in Plaintiff's case by Western Medical Evaluators ("WME") (Doc. 46, Ex. AI); WME was the agreed-upon clinical authority selected by the Pilots' Union and American. (Teklitz Dep. 81:11-14.) As such, any decision made by WME regarding the continuation, nature, and extent of the illness that gave rise to Plaintiff's disability was to be final and binding on both Plaintiff *and* the plan administrator. (*See* Pilot Retirement Benefit Program at 5.4(e), Doc. 46, Ex. A.)

On April 20, 2007, WME forwarded the reports of Dr. Crain and Dr. Seskind to American. (Doc. 46, Ex. AJ.) Dr. Crain's report included a lengthy review of the medical records, up to and including the November 22, 2006 letter from Dr. Gonzalez. (Doc. 46, Ex. AK.) Dr. Crain's report noted that Plaintiff's treating psychiatrist had suggested that Plaintiff was able to resume work in the spring of 2001, but had not pursued his FAA medical certificate for six years. (*Id.*) Dr. Crain also opined that "[t]he psychiatric records show no objective evidence of continuing disability" and that Plaintiff's ongoing treatment with Dr. Gonzalez was for the purposes of monitoring him, "not actually treating symptoms." (*Id.*) Dr. Crain concluded that Plaintiff there was "no evidence of a continuing mental disorder that requires treatment by a psychiatrist." (*Id.*)

Dr. Seskind also noted that Plaintiff had made no attempt to regain an FAA medical certificate. (Doc. 46, Ex. AK.) However, he suggested that the FAA might favorably regard Plaintiff as being able to fly with proper supervision because of the lengthy time period during

5

which Plaintiff had experienced no relapses in his psychosis and had not been taking psychoactive drugs. (*Id.*) Dr. Seskind stated that he has "seen such cases [as Plaintiff's] be given clearance" by the FAA and opined that "there is no evidence for continuing mental disorder that requires treatment by a psychiatrist." (*Id.*) On May 22, 2007, American sent a letter to Plaintiff's counsel informing him of the PBAC's decision that terminating Plaintiff's LTD benefits "was both proper and in accordance with the provisions of the Plan." (Doc. 46, Ex. AL.)

Plaintiff filed his Complaint on February 13, 2008 (Doc. 1); an Amended Complaint was filed on June 16, 2008 (Doc. 15). The only count in the Amended Complaint is for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). Plaintiff and Defendants filed cross-motions for summary judgment on December 8, 2008. (Docs. 38, 44) On November 30, 2009, Magistrate Judge Carlson issued a Report and Recommendation that recommended that Plaintiff's Motion for Summary Judgment be granted and that Defendants' Motion for Summary Judgment be denied. (Doc. 79.) Defendants filed an Objection to the R&R on December 17, 2009. (Doc. 82.) The Objection and both motions have been fully briefed and are currently ripe for disposition.

## **LEGAL STANDARD**

**1.    Report and Recommendation**

Where objections to the magistrate judge's report are filed, the Court must conduct a *de novo* review of the contested portions of the report, *Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989) (citing 28 U.S.C. § 636(b)(1)(c)), provided the objections are both timely and specific, *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984).  In making its *de novo*

review, the Court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge. *See* 28 U.S.C. § 636(b)(1); *Owens v. Beard*, 829 F. Supp. 736, 738 (M.D. Pa. 1993). Although the review is *de novo*, the statute permits the Court to rely on the recommendations of the magistrate judge to the extent it deems proper. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980); *Goney*, 749 F.2d at 7; *Ball v. United States Parole Comm'n*, 849 F. Supp. 328, 330 (M.D. Pa. 1994). Uncontested portions of the report may be reviewed at a standard determined by the district court. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985); *Goney*, 749 F.2d at 7. At the very least, the Court should review uncontested portions for clear error or manifest injustice. *See, e.g., Cruz v. Chater*, 990 F. Supp. 375, 376-77 (M.D. Pa. 1998).

**2.    Summary Judgment**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.

7

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

**1.    Level of Review**

"ERISA provides 'a panoply of remedial devices' for participants and beneficiaries of

benefit plans." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989) (quoting *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)). Under 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought by any ERISA-covered plan beneficiary "to recover benefits due to him under the terms of his plan."

However, ERISA does not specify the proper standard of judicial review for challenges to benefit eligibility determinations by plan fiduciaries. *Firestone*, 489 U.S. at 109. Looking to principles of trust law, the Supreme Court in *Firestone* held that actions under § 1132(a)(1)(B) should be reviewed under a *de novo* standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115. The Court cautioned that any fiduciary who is acting under a conflict of interest must have that conflict weighed in determining whether there has been an abuse of discretion. *Id.* After *Firestone*, the Third Circuit Court of Appeals adjusted the standard of review in benefits denial cases using a "sliding scale" that heightened the standard of review in cases where there was conflict of interest. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 392 (3d Cir. 2000).

The Supreme Court cleared up some lingering confusion over the *Firestone* opinion almost twenty years later in *Metropolitan Life Insurance Company v. Glenn*, 128 S. Ct. 2343 (2008). The Supreme Court held that "the fact that a plan administrator both evaluates claims for benefits and pays benefits claims creates the kind of 'conflict of interest'" referred to in *Firestone*. *Id*. at 2348. The Court further held that in such conflict of interest cases, courts should still review the administrator or fiduciary's decisions under the more deferential arbitrary and capricious standard, but should take into account the conflict when determining

9

whether the administrator had abused its discretion. *Id*. at 2350. It declined adopting special procedural rules, reasoning that "[b]enefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts-which themselves vary in kind and in degree of seriousness-for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review." *Id.* at 2351.

Instead, conflicts continue to be one factor among many to be taken into account during judicial review. *Id.* In close cases, the conflict of interest might act as a "tiebreaker" depending on its case-specific importance. *Id.* According to the Court, where circumstances suggest a higher likelihood that the conflict affected the benefits decisions, such as a history of biased claims administration, the conflict should be weighted more heavily. *Id.* However, where administrators take care to reduce potential bias, the conflict will weight less heavily in the determination. *Id.* Ultimately, the Court affirmed the Sixth Circuit Court of Appeals' decision to set aside MetLife's denial of benefits because it had properly engaged in a "combination-of-factors method of review." *Id.* at 2352.

In light of the Supreme Court's opinion in *MetLife*, the Third Circuit Court of Appeals reconsidered its "sliding scale" approach in *Estate of Kevin Schwing v. The Lilly Health Plan*, 562 F.3d 522 (3d Cir. 2009). The Court of Appeals held that the "sliding scale" approach is no longer valid and that

> "courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or fiduciary abused its discretion."

10

*Estate of Schwing*, 562 F.3d at 525. The court recognized that benefits decisions can arise in many varying contexts and, therefore, "the factors to be considered will be varied and case-specific." *Id.* at 526.

Thus, reviewing courts in this Circuit are to weigh all of the competing context-specific considerations and determine whether the plan administrator or fiduciary acted in a manner that was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 527 (quoting *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). When applying the arbitrary and capricious standard of review, "the court must defer to the administrator of an employee benefit plan unless the administrator's decision is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Abnathaya*, 2 F.3d at 41. The scope of arbitrary and capricious review is narrow and the "'court is not free to substitute its own judgment for that of the defendants in determining the eligibility for plan benefits.'" *Id.* at 45 (quoting *Lucash v. Strick Corp.*, 602 F. Supp. 430, 434 (E.D. Pa. 1984)).

As a preliminary matter, the issue before this Court will be reviewed under the arbitrary and capricious standard of review. Section 11.1(d) of Pilot Retirement Benefit Program says that American Airlines shall be the Administrator and "named fiduciary" of the plan, "except to the extent such responsibility and authority has specifically been assigned" to the PBAC. Section 11.3(c)(iii) of the plan expressly delegates fiduciary duties to the PBAC, including the authority to "decide questions concerning the application or interpretation of the Plan . . . including, but not limited to determinations of eligibility for benefits. Furthermore, Section 13.3 grants the PBAC "discretionary authority to construe the

11

terms of the Plan . . . and . . . shall have discretionary authority to determine eligibility for and entitlement to Plan benefits."

By the plain language of the plan, the PBAC has been assigned discretionary authority as administrator and plan fiduciary to determine eligibility for LTD benefits and to construe the terms of the plan. Therefore, this Court must determine whether, taking into account all of the factors, the PBAC's decision was so arbitrary and capricious as to be unreasonable, unsupported by the evidence, or erroneous as a matter of law. Although there are certain factors that cut toward finding that the decision was an abuse of discretion, the facts and circumstances of this case weigh in favor of holding that the decision to terminate Plaintiff's benefits was not arbitrary and capricious.

**2. Analysis**

**A. The Termination Decision**

Plaintiff first argues that the termination of his LTD benefits was arbitrary and capricious because the termination of benefits was based on the same information that had previously supported Plaintiff's approval for LTD benefits.

As support for the contention that such a reversal is grounds for overturning a termination of benefits, the only published opinion from this circuit cited by Plaintiff is *Harrison v. Prudential Ins. Co.*, 543 F. Supp.2d 411 (E.D. Pa. 2008). In *Harrison*, the plaintiff was granted LTD benefits, but then had those same benefits terminated approximately two months later without any additional medical documents being received by the plan administrator. *Id.* at 418. The district court held that it was a procedural anomaly for a plan administrator to reverse "its initial decision to award benefits despite not receiving any new

12

medical information." *Id.* at 421 (citing *Pinto*, 214 F.3d at 383). According to the court, this type of procedural problem increases the level of conflict of interest, thereby giving rise to a higher degree of scrutiny. *Id. Harrison* relied on *Pinto* to support its decision. Therefore, the reasoning in *Harrison* is of dubious value, given the change in Third Circuit precedent. *Pinto* is the case that created the "sliding scale" approach, no longer applicable in the Third Circuit, as discussed above.

In fact, had the Third Circuit Court of Appeals been ruling on *Pinto* under the currently applicable standard, it seems unlikely that it would have found the administrator's decision in that case to be arbitrary and capricious. *Pinto* involved a similar factual scenario to the case at bar. In *Pinto* the plaintiff received LTD benefits, but had the benefits terminated after an unfavorable social security disability determination. *Pinto*, 214 F.3d at 379-80. After the benefits were terminated, plaintiff's treating physician wrote a letter stating that plaintiff was still disabled. *Id.* at 380. The plan administrator then retained the services of a specialist who concluded that plaintiff was not totally disabled; a second specialist also opined that there was no condition that prohibited the plaintiff from working. *Id.* at 380-81. The court applied a "heightened" arbitrary and capricious standard and found that the administrator had inappropriately terminated the benefits. *Id.* at 394. However, the court suggested that it would have reached a different conclusion if it had applied a more deferential standard. Seemingly, all that the court would have required is *some* evidence on which an administrator can base a decision to terminate benefits. As the court noted in *Pinto*

> Were we to apply extremely deferential arbitrary and capricious review, we would likely affirm the judgment of the district court, *because there is some credible evidence which an administrator could have relied upon* to conclude that [plaintiff] was not totally disabled. Two doctors, one of whom is a specialist

13

> in cardiology, stated that they did not believe that she was totally disabled. Therefore, Reliance Standard's decision was not 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'

*Id.* at 393 (emphasis added). Thus, using a deferential arbitrary and capricious review, the Third Circuit Court of Appeals will uphold a termination of benefits when there is some credible evidence for the administrator to rely on. In this case Plaintiff's own treating psychiatrist provided notes saying that he was asymptomatic. Certainly this is credible evidence that the administrator could rely on to determine a lack of continuing disability. As such, the termination is not arbitrary and capricious.

Furthermore, this case is factually distinguishable from *Harrison*. In *Harrison*, the plan administrator reversed its initial decision on literally the exact same set of medical records and information on which it had relied to approve LTD benefits. In this case, Plaintiff continued to submit new medical records which suggested that he did not have a continuing disability, thereby creating legitimate doubt as to whether Plaintiff could provide verification of his disability, as required by the Plan. In August 2005, June 2006, and September 2006, Plaintiff's treating psychiatrist, Dr. Gonzalez, reported that Plaintiff was asymptomatic. Thus, new information was being received and relied upon by the plan administrator that could lead to the conclusion that Plaintiff was no longer disabled. As such, the decision to terminate benefits was not arbitrary and capricious.

Moreover, simply because benefits are granted erroneously, does not mean that their continuation should be guaranteed. If Plaintiff was asymptomatic as early as 2001, but continued to receive benefits in contradiction of the terms of the plan, this Court has found no caselaw that holds that a plan administrator's errors should act as an estoppel that prevents it from later correcting this mistake. In fact, the Third Circuit Court of Appeals has

held that plan administrators should not be bound to the results of poor administrative practices that are later corrected. *Foley v. International Brotherhood of Electrical Workers Local Union 98 Pension Fund*, 271 F.3d 551, 558 (3d Cir. 2001). Doing so "improperly 'straitjackets' the [administrator] into granting benefits simply because of their past practices." *Id.* (citing *Oster v. Barco of Cal. Employees' Retirement Plan*, 869 F.2d 1215, 1219 (9th Cir.1988)).

Here it could be an oversight; it could be poor administrative practices; or it could be finally being convinced that Plaintiff was no longer eligible. Any of those events would be subject to the poor administrative practices analysis in *Foley*. Therefore, in the instant case, it would be inappropriate to hold the plan administrator responsible for paying LTD benefits in perpetuity on the basis of previously periodic reports of the same asymptomatic state of Plaintiff's condition. To do so would be to punish Defendants for poor practices that had occurred previously and prevent them from rectifying this potential mistake. The administrator is free to review Plaintiff's medical file every ninety (90) days. In this case, it did so and found that it had been improperly paying benefits. To stop paying benefits upon discovery of this information is not arbitrary and capricious.

### B. The Termination Letter

Plaintiff also argues that Defendants' actions were arbitrary and capricious because they failed to provide Plaintiff with adequate explanations and information regarding the termination of benefits. Plaintiff also contends that Defendants failed to adhere to the regulations governing ERISA, citing 29 C.F.R. § 2560.503-1(g). By its own language, the "scope and purpose" of the cited regulation is to govern the requirements for compliance with 29 U.S.C. §§ 1133, 1135. Neither section is pertinent to this case, which is brought pursuant

15

to 29 U.S.C. § 1132(a)(1)(B).

Plaintiff also claims that the termination letter did not sufficiently describe the reason why Plaintiff's LTD benefits were terminated. However a reading of the letter plainly controverts this assertion. The second paragraph of the letter quotes the pertinent portion of the Plan regarding termination of benefits for failure establish continuing verification of his disability. Two paragraphs later, the letter says "verification of your disability cannot be established and your disability benefits under the Plan will end immediately." This is an acceptable and adequate explanation of why Plaintiff's benefits were being terminated. The letter cited the portion being relied on by Defendants and then specifically applied it the Plaintiff.

More troubling is the letter's statement that Plaintiff would need to demonstrate that he is actively pursuing FAA medical certification, which is nowhere to be found in the plan. Plaintiff argues that imposing requirements outside the Plan's plain language is arbitrary and capricious as a matter of law. In *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-43 (3d Cir. 1997), the Third Circuit Court of Appeals held that a plan administrator acted in an arbitrary and capricious manner when it required the plaintiff to submit objective medical evidence of his chronic fatigue syndrome, even though no such requirement existed in the plan's language. However, the court of appeals' holding was limited to the specific context of the case before it; the termination was based solely on the failure to submit objective evidence, which is nearly impossible given the unclear etiology of chronic fatigue syndrome. *Id.* at 442. Likewise, in *Epright v. Environmental Resources Management, Inc.*, 81 F.3d 335, 342-43, the Third Circuit Court of Appeals held that where a termination is based on a requirement extrinsic to the plan, such action is not reasonable and is, therefore, arbitrary and

16

capricious.

Although the inclusion of the FAA language in the termination letter is regrettable and references requirements that are not a part of the Plan, the decision to terminate benefits was ultimately based on the lack of medical evidence that established ongoing verification of Plaintiff's disability. The first paragraph on the letter explains that "we are unable to verify either the existence of a continuing medical disability or your continued substantial progress towards obtaining your FAA medical certification." The disjunctive nature of this sentence suggests that the termination of benefits could have been based on the inability to verify ongoing disability alone. Thus, the FAA language in the letter is harmless error on the part of the plan administrator as the failure to provide evidence of Plaintiff's disability was sufficient to terminate his benefits. The letter also concludes by asserting the termination of LTD benefits is based on the inability to establish a continued disability. As noted above, a reviewing court must take all the context-specific factors into account before determining whether the plan administrator acted in a manner that was arbitrary and capricious. In this case, the FAA language certainly cuts in favor of a holding that the Defendants acted in an arbitrary and capricious manner. However, the limited nature of this Court's review, coupled with the overriding language regarding continued disability in the letter ultimately demonstrate that the Defendants were not acting in an arbitrary and capricious manner when they terminated Plaintiff's benefits.

**C.     The WME Evaluation**

Plaintiff also attacks the WME evaluation on two fronts: 1) he claims that the evaluation itself was faulty because it did not specifically discuss Plaintiff's job requirements, anxiety diagnosis, and ongoing medical treatment, and 2) that the PBAC acted in an arbitrary and

17

capricious manner by failing to request a further review of WME's evaluation due to these omissions and deficiencies.

Notably, the Plan does not require the clinical authority chosen by the Pilots' Union and American to incorporate any of the so-called deficiencies in its report. All that is required is that the clinical authority make findings regarding the nature and extent of the alleged disability. That is precisely what WME did in the case at bar. Dr. Crain undertook a thorough review of the records at his disposal, highlighting specific office notes, and coming to the conclusion that Plaintiff's medical file no longer supported a finding of disability. In his discussion, Dr. Crain noted that at the outset of his treatment with Dr. Gonzalez, "the picture [of Plaintiff's health] was that of anxiety with obsessive-compulsive features." After a review of the records, Dr. Crain opined that "Mr. Miller does not have overt evidence of a treatable medical condition." Ostensibly, this includes all of the diagnoses for which Dr. Gonzalez had been treating Plaintiff, including anxiety. Furthermore, it was not arbitrary or capricious for the PBAC to rely on WME's medical opinions. WME undertook a comprehensive discussion of the medical record, and explained its reasons for deciding that Plaintiff no longer had a disability. More importantly, the evaluation from WME answers all of the questions posed by the Defendants when they sent Plaintiff's medical file out for review. It is unclear why a follow-up with WME would have been necessary.

Also, the WME review is part of a collectively-bargained review process agreed upon by American and the Pilots' Union. Any time a dispute arose regarding the existence of a continuing disability, the medical file would be sent to an outside party to review the records and make a determination regarding the disability. To avoid the possibility of conflict, both the Pilots' Union and American would agree on the reviewers and would share the cost of the

18

review, lest the reviewer be tempted to agree with the side that was paying for the evaluation. Due to the independent nature of this review, the decision was anticipated to be final and binding on *both* American and the employee. American and the PBAC followed this procedure to the letter. It would be imprudent to hold that Defendants were acting in an arbitrary and capricious manner when they followed the procedures outlined in a collectively bargained pension plan. Plaintiff had an opportunity to present any pertinent documents on appeal, which would have also been reviewed by WME. Had WME found that Plaintiff did have a disability, that decision would have been equally final and binding on the PBAC and American. As such, the reliance on the WME report is not arbitrary and capricious at all, but simply an implementation of the review process specifically envisioned by the Plan.

## **CONCLUSION**

This Court's review of a plan administrator's decision is a narrow one, and we must be careful not to substitute our judgment for that of the administrator. Considering all of the case-specific factors within the context of the case at bar, the Defendants' decision to deny Plaintiff Long-Term Disability Benefits was reasonable, supported by the evidence, and not erroneous as matter of law. Therefore, it was not arbitrary and capricious and must be upheld. Thus, Defendant's Motion for Summary Judgment will be granted and Plaintiff's Motion for Summary Judgment will be denied. An appropriate Order follows.

March 8, 2010  /s/ A. Richard Caputo
Date  A. Richard Caputo
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT T. MILLER<br><br>Plaintiff,<br>v.<br>AMERICAN AIRLINES, INC., et al.,<br><br>Defendants. | CIVIL ACTION NO. 3:08-CV-277<br><br>(JUDGE CAPUTO)<br>(MAGISTRATE JUDGE CARLSON) |

### ORDER

**NOW**, this __8th__ day of March, 2010, **IT IS HEREBY ORDERED** that:

(1) The Magistrate Judge's Report and Recommendation is **REJECTED.**
(2) Defendants' Motion for Summary Judgment is **GRANTED**.
(3) Plaintiff's Motion for Summary Judgment is **DENIED**.
(4) **JUDGMENT IS ENTERED** in favor of Defendant.
(5) The Clerk of Court shall mark this case as **CLOSED**.

                                                  /s/ A. Richard Caputo
                                                  A. Richard Caputo
                                                  United States District Judge